**Bruce LUNDSTROM and Vonnie Lundstrom, Appellants**

v.

**UNITED SERVICES AUTOMOBILE ASSOCIATION–CIC, Appellee.**

**No. 14–04–00357–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 26, 2006.

Stephen W. Boyd, San Antonio, and Craig Stephen Smith, Corpus Christi, for appellants.

Brad Austin Allen, Christopher W. Martin, Levon Hovnatanian, Dolores Christene Wood, Bruce E. Ramage, Houston, for appellees.

Panel consists of Justices EDELMAN, SEYMORE, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

In this homeowners insurance coverage case, we primarily examine the propriety of the insurer's denial of coverage under the 1996 revised version of the Homeowners Form B (HO–B) insurance policy as prescribed by the Texas Department of Insurance. The case is before us on the Lundstroms' (the insureds') appeal from a summary judgment in favor of appellee United States Automobile Association–CIC ("USAA"), the insurer. Because (1) the summary judgment proof conclusively establishes USAA's defenses to the Lundstroms' contractual and bad faith claims and (2) the Lundstroms did not produce evidence to support their claim under former Insurance Code Article 21.55, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 1998, the Lundstroms purchased a townhome from Gary Baker, the townhome's builder. The Lundstroms paid $279,900 for the townhome, moved in

immediately, and insured the dwelling with USAA for $256,000.[1]

Shortly after they moved in, the Lundstroms noticed water entering the townhome. After a storm in the "early fall, late summer of '98," the Lundstroms found water in the stairwell. The Lundstroms called Baker to tell him about the problems. They did not notify USAA.

In the fall of 1998, the Lundstroms noticed more water was entering the townhome. They saw one or two wet spots, five or six inches in diameter, on the ceiling. Again, the Lundstroms called Baker, but did not contact USAA.

In February 1999, Vonnie Lundstrom wrote Baker complaining about continued leakage in the master bathroom and a damp, musty odor in the first floor stairwell. She also expressed concern that excess moisture was seeping through the foundation. As on the two prior occasions, Lundstroms did not contact USAA.

In the early summer of 1999, the Lundstroms noticed still more water leakage during some rainstorms. The water problems continued throughout that summer. The Lundstroms continued to notify Baker, but did not inform USAA. Baker tried to fix the problems and to repair the water damage to the Lundstroms' townhome. However, in July 1999, his workmen failed to properly cover a hole they cut in the Lundstroms' fourth-floor patio/roof. During a rain, water came through the hole, damaging clothes, carpet, and books. The Lundstroms wrote Baker and offered to "settle this matter for $700," but again did not contact USAA.

In April 2000, the Lundstroms experienced leaks in the master bathroom, master closet, and stairwell during some heavy

rains. More water stains and water spots appeared on the ceiling. The Lundstroms again contacted Baker, but not USAA. Shortly thereafter, Baker again attempted to address the water problems. As part of Baker's attempt to fix the problems, his contractors again cut a hole in the fourth-floor patio/roof. The workers left the hole uncovered, and a heavy rain fell. Around May 20, 2000, rain poured into the townhome through the hole. In late May 2000, the Lundstroms reported a claim to USAA.

On June 5, 2000, the Lundstroms filed a *pro se* lawsuit against Baker individually, his construction companies, and the real estate agent who sold the Lundstroms the townhome (the "Baker lawsuit"). Four days later, the Lundstroms wrote Baker complaining about his faulty attachment of a protective tarp on the fourth-floor patio/roof and reported that, because the tarp did not hold, rain again poured into the townhome. They also complained Baker had intentionally plugged the drain on the fourth-floor patio/roof so rainwater could not go down the drain, and therefore had nowhere to go except into the townhome itself.

From mid-April to mid-June 2001, All–Around Plumbing Company, HDR Engineering, and Casteel Automatic Fire Protection performed various tests and inspections on the townhouse. All–Around found no leaks in the townhome's domestic water system or sanitary sewer system.

On the northeast corner of the townhouse, HDR found a soda can in the interior of the downspout near the bottom of the scupper box.[2] The soda can obstructed the downspout and the scupper, blocking

---

1. They insured "other structures" for $25,000.

2. A scupper is an opening to allow water to drain off a floor or flat roof. WEBSTER'S THIRD INT'L DICTIONARY 2044 (1993).

normal flow in the scupper system and allowing rainwater to "pond" on the roof. According to HDR, this blockage caused (1) staining of the wall and ceiling finishes and the wall framing at the stairwell between the second and third and third and fourth levels, (2) deterioration of the wall framing in the stairwell between the second and third levels, and (3) staining of the wall framing in the entry closet riser room and the main entry porch.

Casteel Automatic Fire Protection tested the fire sprinkler system. Casteel found the fire sprinkler system was "turned off and dry," i.e., "shut down." Casteel also found the fire sprinkler system had not been inspected, monitored, or maintained.

When Casteel activated the system to test it, water leaked from the ceiling of the riser closet, located in the northeast corner of the townhouse. Leaks also appeared in the air conditioner closet on the fourth floor, around the main entry door frame, and in the ceiling finish in the front porch. Casteel removed an area of ceiling finish and found a leak on the line serving the fire sprinkler heads below the stairwell between the first and second levels. Casteel disconnected the pipe to test the remainder of the system. At a pressure of forty-eight pounds per square inch (psi), Casteel did not find any other leaks.

At some point, a disagreement arose between USAA and the Lundstroms regarding coverage. On July 17, 2001, USAA denied coverage for at least some of the Lundstroms' claimed losses.[3]

In November 2001, USAA exercised its contractual right to a binding appraisal regarding the damages to the interior of the townhome caused by the "initial wetting." The Lundstroms received notice of the impending appraisal, but did not participate.

The appraisal umpire awarded the Lundstroms $4,226.19 ($1,666.19 after the deductible) for the initial wetting. USAA tendered payment of $1,666.19 to the Lundstroms, and they deposited the check.

On September 17, 2002, the Lundstroms settled with the Baker lawsuit defendants. The parties executed a "Compromise Settlement Agreement and Mutual Release," under which the Lundstroms were to receive a gross total sum of $400,000. The real estate agent contributed $45,000 and Baker contributed $355,000. As part of his contribution, Baker agreed to repurchase the townhouse from the Lundstroms for $95,000, and the sale was completed two days later. According to the terms of the settlement agreement, in addition to the $95,000 allocated for the purchase price of the townhouse, $30,000 was allocated as payment for damages to household contents and furnishings, and $275,000 was allocated as payment for "claims for damages for personal physical injuries or physical sickness allegedly suffered by the Lundstroms."

Two months after settling the Baker lawsuit, the Lundstroms sued USAA, alleging breach of the insurance contract, breach of the duty of good faith and fair dealing, violation of the Deceptive Trade Practices Act—Consumer Protection Act (DTPA),[4] unfair insurance practices,[5] and

---

3. Neither party included a reservation of rights letter or a written denial of claim as part of the summary judgment proof. The July 17, 2001 date appears in a letter from Vonnie Lundstrom to USAA's Senior Property Field Adjuster.

4. See TEX. BUS. & COM.CODE ANN. §§ 17.41–.885 (Vernon 2002 & Supp.2005).

5. See Act of May 19, 1995, 74th Leg., R.S., ch 414, § 11, 1995 Tex. Gen. Laws 2988, 2997–3000 (amended 1995, 2001) (repealed and

violations of former Insurance Code article 21.55.[6] USAA moved for summary judgment on traditional and no evidence grounds. In the traditional portion of its motion, USAA argued that the Lundstroms' contractual claims were barred on the following grounds: (1) as a result of the Baker lawsuit, *res judicata* precluded the present suit, (2) the Lundstroms' settlement in the Baker lawsuit had fully compensated them for the damages claimed in the present lawsuit,[7] (3) the Lundstroms' claimed losses were excluded under the insurance policy, (4) the Lundstroms failed to segregate covered and non-covered losses, (5) the Lundstroms failed to provide USAA with timely notice of their claims, and (6) there was a binding appraisal of the covered claims. USAA asserted that the extra-contractual claims for violation of the duty of good faith and fair dealing (the "bad faith claim"), DTPA violations, and violations of the insurance code were barred because a good faith dispute existed regarding coverage. In the no-evidence portion of its motion, USAA argued there was no evidence of one or more specified elements of each of the Lundstroms' causes of action.

The trial court granted USAA's motion without specifying the grounds and dismissed all the Lundstroms' claims with prejudice. In multiple issues and arguments, the Lundstroms now challenge the trial court's summary judgment in favor of USAA on all of the Lundstroms' causes of action.

## II. ISSUES PRESENTED AND STANDARD OF REVIEW

The Lundstroms frame their issues as follows: (1) whether the summary judgment should be reversed; (2) whether the law bars an insured who suffers covered and uncovered losses from suing the tortfeasor to recover uncovered damages and then suing the insurance company for covered losses; (3) whether USAA conclusively proved none of the Lundstroms' losses were covered by their HO–B policy; (4) whether more than a scintilla of evidence supports the Lundstroms' contract claim; (5) whether legally sufficient evidence supports the Lundstroms' bad faith claim; (6) whether more than a scintilla of evidence supports the challenged elements of the Lundstroms' Insurance Code and DTPA claims; (7) whether legally sufficient evidence supports the Lundstroms' recovery under former article 21.55 of the Texas Insurance Code; and (8) whether the appraisal clause negates the Lundstroms' right to recover from USAA.[8] The Lund-

---

recodified 2003) (current version at Tex. Ins. Code Ann. § 542.003 (Vernon Supp.2005)).

**6.** *See* Act of May 27, 1991, 72nd Leg., R.S., ch 242, § 11.03, art. 21.55, 1991 Tex. Gen. Laws 939, 1043–45 (repealed and recodified 2003) (current version at Tex. Ins.Code Ann. § 542.055 (Vernon Supp.2005)). The Lundstroms also alleged USAA waived, and was estopped from asserting, any defenses, conditions, exclusions, or exceptions to coverage not contained in any reservation of rights letter. They did not allege what those defenses, conditions, exclusions, or exceptions were. The Lundstroms did not renew this argument in their response to USAA's motion for summary judgment or in their brief before this court.

**7.** USAA also invoked the "one satisfaction rule" and claimed it was entitled to full credit paid to the Lundstroms in settlement of the Baker lawsuit.

**8.** They list the following sub-issue under issue two: "Does the 'made whole' doctrine encourage or require such litigation? *Ortiz v. Great Southern Fire and Casualty Insurance Company,* 597 S.W.2d 342, 343–44 (Tex. 1980)." They list the following two sub-issues under issue three: "Does some evidence show coverage under the 'accidental discharge' clause? Does some evidence show coverage under the 'ensuing loss' clause?"

stroms then argue (1) if preserved, USAA's objections to summary judgment evidence should be denied; (2) USAA did not conclusively prove the "one satisfaction rule," *res judicata,* or a dollar for dollar settlement credit bars their claim; (3) USAA did not conclusively prove it was entitled to summary judgment on coverage; (4) the Lundstroms presented legally sufficient summary judgment evidence on each element of the causes of action USAA challenged in its no evidence summary judgment motion; (5) USAA did not conclusively prove the appraisal clause bars their claim for breach of contract; and (6) USAA did not conclusively prove the Lundstroms failed to timely notify USAA of their loss. Although the Lundstroms' arguments do not directly mirror their issues, their issues and arguments are directed at USAA's alleged grounds for summary judgment and challenge the propriety of the trial court's summary judgment in favor of USAA.

A defendant moving for traditional summary judgment assumes the burden of showing as a matter of law the plaintiff has no cause of action. *Levesque v. Wilkens,* 57 S.W.3d 499, 503 (Tex.App.-Houston [14th Dist.] 2001, no pet.). Traditional summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

In reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the nonmovant, and we make all reasonable inferences in the nonmovant's favor. *Dolcefino v. Randolph,* 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judg-

ment as a matter of law, the burden shifts to the nonmovant to raise a genuine material fact issue sufficient to defeat summary judgment. *Id.*

In reviewing a no-evidence motion for summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence of probative force to raise a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Id., Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 206–08 (Tex.2002). We take as true all evidence favorable to the nonmovant, and we draw all reasonable inferences from the evidence in the nonmovant's favor. *Dolcefino,* 19 S.W.3d at 916. A trial court must grant a no-evidence summary judgment if the party opposing the motion does not respond with competent summary-judgment evidence that raises a genuine issue of material fact.

We will sustain the trial court's judgment if (1) there is a complete absence of proof of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Baty v. Protech Ins. Agency,* 63 S.W.3d 841, 847 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Less than a scintilla of evidence exists when the evidence offered to prove a vital fact is so weak it does no more than create a mere surmise or suspicion of its existence, and in legal effect is no evidence. *Coastal Conduit & Ditching v. Noram Energy Corp.,* 29 S.W.3d 282, 284–85 (Tex. App.-Houston [14th Dist.] 2000, no pet).

We review a summary judgment de novo. *Provident Life and Accident Ins.*

*Co. v. Knott,* 128 S.W.3d 211, 215 (Tex. 2003). If, as here, the trial court grants a motion for summary judgment without stating the grounds on which it relied, we must affirm the summary judgment if any ground argued in the motion is sufficient. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989). Thus, if the Lundstroms fail to negate each ground on which the judgment may have been rendered for any given claim, we must uphold the summary judgment as to that claim. *See State Farm Fire & Cas. Co. v. S.S. & G.W.,* 858 S.W.2d 374, 381 (Tex.1993). In the following analysis we therefore consider each of the Lundstroms claims in relation to the summary judgment ground or grounds USAA asserted in relation to that claim.

### III. ANALYSIS

#### A. Is Summary Judgment Proper on the Lundstroms' Breach of Contract Claim?

1. What claim, loss, and damage are in question?

In order to review the propriety of the summary judgment against the Lundstroms on their breach of contract cause of action, we must first determine what specific "claims" the Lundstroms contend USAA wrongly denied, *i.e.,* what "losses" they contend USAA wrongly refused to cover. In their pleadings, their response to USAA's motion for summary judgment, and their brief in this court, the Lundstroms refer variously to water damage from sprinkler system leaks, a blocked scupper and downspout, and water entering through a hole in a fourth floor patio/roof.

The summary judgment proof shows the Lundstroms experienced water intrusions beginning in July or August of 1998. In February 1999, they informed the builder they were experiencing continued leaks and a damp musty odor. They also informed the builder they had experienced water damage in the master closet in July 1999, when workers had failed to cover the roof during construction. In late May 2000, during a heavy storm, water allegedly poured into the Lundstroms' townhome through a hole in the roof left by the builder's workers. The parties agree the Lundstroms did not inform USAA of any claim until May 2000.[9]

As a ground for traditional summary judgment, USAA asserted the Lundstroms had failed to comply with the provision of their policy requiring them, "after loss," to "give prompt written notice to [USAA] of the facts relating to the claim." As proof of non-compliance, USAA referred to the Lundstroms' "history of water damage in the Townhouse" dating from 1998.

The Lundstroms responded that the 1998 leak was minor and they did not believe it was covered. They further stated, "It was not until April or May 2000 that it was determined that water damage and mold contamination behind the walls of the structure had severely damaged the residence. Within one month after the discovery of the damage, the Lundstroms notified USAA of the claim."

In their appellate brief, the Lundstroms argue, "The evidence showed the Lundstroms experienced some minor water damage between 1998 and May of 2000.... In April or May of 2000 significant water damage occurred after the builder attempted to repair portions of the fourth floor balcony." Nevertheless, re-

---

9. In their original petition and first amended petition, the Lundstroms represented they reported their loss "on or about May 14, 2001." In a letter to the USAA Senior Property Field Adjustor, however, Vonnie Lundstrom refers to having first reported the "claim" in "May 2000." The May 2000 date is consistent with her deposition testimony. At oral argument, both parties agreed the Lundstroms reported their claim in May 2000.

garding coverage issues, the Lundstroms argue, in part, their losses are covered under the provision for accidental discharge from within a plumbing system. They further argue the sprinkler system and the roof drains and scuppers—which the summary judgment proof shows are not in the same area of the townhouse as the fourth floor balcony—are part of the "plumbing system."

In its appellate brief, USAA places significant reliance on its summary judgment ground of untimely notice. In response, counsel for the Lundstroms stated at oral argument, "This is a water damage case." He clarified that the water intrusion at issue occurred during a rainstorm in May 2000, when water entered the house through a hole in the roof.[10] He further represented all water intrusions before the May 2000 rainstorm were "inconsequential" and therefore there was no need to notify USAA of those intrusions.[11]

Accordingly, we construe the Lundstroms' "claim" as being for the "loss" that resulted from the May 2000 rainstorm, when rain entered through a hole in the patio/roof, and not for losses resulting from water intrusions caused by the sprinkler system or the blocked scupper and downspout. *See Tourneau Houston, Inc. v. Harris County Appraisal Dist.*, 24 S.W.3d 907, 909 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (citing *Bates v. Dallas Indep. Sch. Dist.*, 952 S.W.2d 543, 550 (Tex.App.-Dallas 1997, writ denied), for proposition that appellate court may refuse to consider issue conceded by party at oral argument). We therefore analyze the propriety of the summary judgment in relation to the claim for loss from the May 2000 water intrusion through the hole in the patio/roof.

**2. Did USAA Breach the Insurance Contract in Relation to the Loss from the May 2000 Water Intrusion?**

*a. Was the Covered Portion of the Lundstroms' Claim Properly Resolved by Binding Appraisal?*

---

**10.** According to the summary judgment proof, on May 19, 2000, Bruce Lundstrom called the builder to report it was raining and his roof was "an open wound." On May 20, 2000, he called to report "water gushing into [his] house." Nevertheless, at oral argument, counsel referred to the rainstorm as occurring "May 21, 2001." Presumably he meant "2000." This interpretation would be consistent with the parties' agreement at oral argument that the Lundstroms notified USAA of the rainstorm loss in May 2000.

**11.** Alleged losses from water intrusions predating the May 2000 rainstorm included losses related to the sprinkler system and the blocked scupper and downspout, both of which were located on the north side of the townhouse, an area in which the Lundstroms stated they noticed water spotting as early as August 1998. The Lundstroms' belief that these losses were below their deductible would not necessarily excuse them from timely notifying USAA of any facts related to claims for these losses. *See Edwards v. Rang-*

*er Ins. Co.*, 456 S.W.2d 419, 421 (Tex.Civ. App.-Fort Worth 1970, writ ref'd n.r.e.) (holding insured breached contract by waiting forty-six days to give insured notice of the accident or occurrence out of which his loss arose when insured's excuse for the delay was his belief the cost of repairing the damage would not exceed the deductible amount). Also, the Lundstroms' statement that they first learned of mold damage in 2000 would not necessarily excuse them from timely reporting the earlier leakage of which they were aware. *See Hood v. State Farm Lloyds*, No. Civ.A.H.–03–2612, 2004 WL 1490377, at *2 (S.D.Tex. May 17, 2004) (stating, because of consistent, obvious leaks in roof, insured had duty to investigate for mold or other consequences); *see also Flores v. Allstate Tex. Lloyd's Co.*, 278 F.Supp.2d 810, 816 (S.D.Tex.2003) (stating homeowner cannot sit back and watch mold grow in home or observe obvious mold-instigating event—such a flooding or continuous leak that saturates surface—and not notify insurers, but holding, on facts before it, that notice was timely).

As a ground for summary judgment, USAA asserted the covered portion of the Lundstroms' claim had been resolved by binding appraisal. The policy contains the following provision:

**Appraisal.** If you and we fail to agree on the actual cash value, amount of loss or the cost of repair or replacement, either can make a written demand for appraisal. Each will then select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a district court of a judicial district where the loss occurred. The two appraisers will then set the amount of loss, stating separately the actual cash value and loss to each item. If you or we request that they do so, the appraisers will also set:

a. the full replacement cost of the dwelling.

b. the full replacement cost of any other building upon which loss is claimed.

c. the full cost of repair or replacement of loss to such building, without deduction for depreciation.

If the appraisers fail to agree, they will submit their differences to the umpire. An itemized decision agreed to by any two of these three and filed with us will set the amount of the loss. Such award shall be binding on you and us.

Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally.

USAA twice notified the Lundstroms it intended to invoke the appraisal process to "identify, and rule on, damages caused to the interior of [the Lundstroms'] home from the initial wetting." The notifications also informed the Lundstroms, "The Appraisal process will not address damages involving the ongoing leaking or mold that has resulted. This is a coverage issue, which we have discusse[d] and denied. It is the duty of the Appraisers to address property damages and not address policy conditions or coverage." The Lundstroms declined to participate in the appraisal process. On September 23, 2002, the appraisal umpire awarded $4,226.19 as the total amount of loss for the "initial wetting (water)."

▮▮▮ Appraisal awards made under the provisions of an insurance contract are binding and enforceable, and a court will indulge every reasonable presumption to sustain an appraisal award. *See Franco v. Slavonic Mut. Fire Ins.,* 154 S.W.3d 777, 786 (Tex.App.-Houston [14th Dist] 2004, no pet.). The effect of an appraisal provision is to estop one party from contesting the issue of damages in a suit on the insurance contract, leaving only the question of liability for the court. *Id.* Because a court indulges every reasonable presumption to sustain an appraisal award, the burden of proof is on the party seeking to avoid the award. *Id.* There are, however, three situations in which the results of an otherwise binding appraisal may be disregarded: (1) when the award was made without authority; (2) when the award was made as a result of fraud, accident, or mistake; or (3) when the award was not in compliance with the requirements of the policy. *Id.*

▮▮▮ The Lundstroms contend the umpire's award is void for lack of authority because the appraisal clause can be invoked only when the scope of damage is agreed and not when coverage or causation is disputed. In support, they cite *Wells v. American States Preferred Insurance Co.,* 919 S.W.2d 679 (Tex.App.-Dallas

1996, writ denied). *Wells* is distinguishable and we decline to read *Wells* as broadly as the Lundstroms would have us do.

In *Wells,* after the insureds' home sustained damage from foundation movement, the insureds investigated and discovered a leak in the plumbing system under the foundation. *Id.* at 681. A structural engineer inspected the property and reported that the plumbing leak caused the foundation movement. *Id.* The insureds then made a claim on their homeowners policy. *Id.* The insurance company's adjuster inspected the property and opined the sewer-line leak did not cause the damage. *Id.* The insurance company's own inspector also concluded the plumbing leak did not cause the foundation movement, and the insurance company subsequently denied the claim. *Id.* At the same time, the insurance company demanded an appraisal under an appraisal provision identical to the one in the present case. *See id.*

Both appraisers and the umpire unanimously determined that the insureds' home had resulting damage in the amount of $22,875.94 to the dwelling due to foundation movement. *Id.* at 682. However, the insurance company's appraiser and the umpire determined damage to the dwelling related to the plumbing leak was zero. *Id.* The appraisal award contained the following recital:

Damage to dwelling related to plumbing leak.

Loss Replacement Cost –0–

Loss Actual Cash Value –0–

. . . . .

CLARIFICATIONS IF ANY: Resulting damage to dwelling due to foundation movement $22,875.94

*Id.* at 683.

The insurance company filed a motion for summary judgment based on the determination the plumbing leak did not cause the claimed loss. *Id.* at 682. The insureds filed their own motion for partial summary judgment based on the unanimous determination of the appraisers and umpire that the amount of loss to the dwelling resulting from foundation movement was $22,875.94. *Id.* The trial court granted the insurance company's motion, denied the insureds' motion, and rendered a take-nothing summary judgment against the insureds. *Id.*

The court of appeals reversed. After examining case law from other jurisdictions and considering the language of the appraisal provision, the court concluded the appraisal panel's authority was limited to determining the amount of loss:

We conclude that the authority of the appraisal panel in the present case was limited to determining only the amount of loss. Therefore, we conclude further that the appraisal section of the policy, as a matter of law, did not authorize and empower the appraisal panel to determine that the plumbing leak did not cause the loss to the [insureds'] property. It follows, and we so hold, that the appraisal section of the Texas Homeowner's Policy quoted above establishes an appraisal procedure to determine the dollar amount of the insured's loss only, and that it does not authorize or empower the appraisal panel created thereunder to determine what caused or did not cause that loss. Indeed, we hold that, absent an agreement to the contrary, questions of what caused or did not cause the loss are questions to be decided by the court. Moreover, we hold that participation by the insured in the appraisal process does not constitute agreement by the insured to authorize and empower the appraisal panel to determine questions of what caused or did not cause the loss.

In the present case, we conclude that the one appraiser and the umpire exceeded their authority when they determined that the plumbing leak did not cause the [insureds'] loss. It follows, and we so hold, that the trial court erred in finding that American States is entitled to a declaratory summary judgment maturing the appraisal award in the present case and entering a take-nothing summary judgment against the [insureds] based upon that determination. *Id.* at 685.

Unlike *Wells*, there were no coverage issues before the umpire and appraiser in the present case. Instead, USAA agreed to cover the loss occurring at the time of the initial water intrusion and requested that the appraisers determine the amount of that loss. Also, unlike *Wells*, the appraisal (umpire's) award does not partition a loss among various causes. Finally, although USAA, in its letters invoking the right to an appraisal, referred to "damages caused … from the initial wetting," it is clear from the context that USAA was referring to damages in existence at a point in time and distinguishing those damages from damages occurring subsequently.

To the extent the Lundstroms would have us read *Wells* to mean appraisers exceed the scope of their authority whenever causation factors into the award, we decline to do so. The cases cited in *Wells* stand for the narrower proposition that appraisers exceed their authority when they engage in making the legal determination of what is or is not a covered loss based on their determination of what caused the loss or a portion of it. *See, e.g., Wausau Ins. Co. v. Herbert Halperin Dist.*

*Corp.*, 664 F.Supp. 987, 989 (D.Md.1987) (observing that insurance company was not *"factually"* disputing the consequences of the occurrence," but contesting the issue of legal causation on basis that policy exclusions applied to limit scope of coverage, *i.e.*, the issue was one of contract interpretation and for the court, not the appraiser to resolve); *Munn v. Nat'l Fire Ins. Co. of Hartford*, 237 Miss. 641, 115 So.2d 54, 56, 57 (1959) (stating finding of appraisers on question of coverage would be question of law and not final; and observing, if storm caused damage, insurance companies would be liable, but if other force or agency than those listed in policy caused damage insurance companies not liable); *see also CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*, 110 F.Supp.2d 259, 265, 267, 268 (D.Del.2000) (faulting parties for confusing "amount of loss," and "coverage," and concluding, under circumstances of case, determination of amount of loss under appraisal clause included determination of causation).[12]

*b. Is Loss Caused by Mold Covered under the Lundstroms' Homeowners Policy?*

■ As a separate ground for traditional summary judgment, USAA contended the Lundstroms' homeowners policy excluded coverage for their loss. The Lundstroms' policy contained the following coverage provisions:

### SECTION I—PERILS INSURED AGAINST

**COVERAGE A (DWELLING)**

We insure against all risk of physical loss to the property described in Section I Property Coverage, Coverage A

---

12. The Lundstroms contend the summary judgment proof showed USAA breached the contract on July 17, 2001, and they were not bound by the policy provisions after that point. As discussed in this section and the following section, we conclude USAA did not breach the contract.

(Dwelling) unless the loss is excluded in Section I Exclusions.

## COVERAGE B (PERSONAL PROPERTY)

We insure against physical loss to the property described in Section I Property Coverage, Coverage B (Personal Property) caused by a peril listed below, unless the loss is excluded in Section I Exclusions.

. . . .

9. **Accidental Discharge, Leakage or Overflow of Water of Steam** from within a plumbing, heating or air conditioning system or household appliance.

A loss resulting from this peril includes the cost of tearing out and replacing any part of the building necessary to repair or replace the system or appliance. But this does not include loss to the system or appliance from which the water or steam escaped.

Exclusions 1.a. through 1.h. under Section I Exclusions do not apply to loss caused by this peril.

## SECTION I—EXCLUSIONS

1. The following exclusions apply to loss to property described under Coverage A (Dwelling) or Coverage B (Personal Property), but they do not apply to an ensuing loss caused by fire, smoke or explosion.

. . . .

f. We do not cover loss caused by:

(1) wear and tear, deterioration or loss caused by any quality in property that causes it to damage or destroy itself.

(2) rust, rot, mold or other fungi.

. . . .

We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under this policy.

In its summary judgment motion, USAA cited the paragraph f(1) exclusion and argued, "Therefore, the fact that the Townhouse contained numerous building defects that allowed water to penetrate the home bars coverage for any damages resulting from the same." USAA also referred to the umpire's award discussed above and argued the only portion of the claim that was covered had been permanently resolved. Finally, USAA argued the Lundstroms' mold claims were expressly excluded under paragraph f(2). In their response, the Lundstroms acknowledged the policy exclusions for building defects and mold, but invoked the ensuing loss provision of paragraph f.

Under paragraph f(2) of the policy, USAA specifically excludes from coverage "loss caused by ... mold or other fungi." As an exception to the exclusion, however, USAA does "cover ensuing loss caused by ... water damage." The question is whether the alleged mold damage in the present case is covered under the ensuing loss exception to the mold exclusion.[13]

13. The applicability of an exception to an exclusion is a question of coverage, on which the insured has the burden of proof. *Telepak v. United Servs. Auto. Ass'n*, 887 S.W.2d 506, 506 (Tex.App.-San Antonio 1994, writ denied); *see Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 193 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (discussing insured's initial burden of proving coverage, insurer's subsequent burden of proving exclusion to deny coverage, and insured's subsequent burden to prove exception to exclusion). In addition to invoking the ensuing loss exception, the Lundstroms invoked the accidental discharge provision in paragraph 9 under Coverage B. In the latter

In construing an insurance contract, we apply the same rules we apply to the construction of other contracts. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex.1998). Our primary goal is to give effect to the written expression of the parties' intent. *Id.* at 741. We must read the contract as a whole, "striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Id.* Nevertheless, when, as here, the policy forms are mandated by a state regulatory agency, the actual intent of the parties is not material. *Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex.2003). Instead, we are to determine the ordinary, everyday meaning of the words to the general public. *Id.* Our inquiry is, " 'first, an effort to determine the ordinary lay meaning of the words to the general public, and, in light of this meaning, it is, second, an examination of the choice the purchaser had and the choice he made.' " *Id.* at 552 (quoting *U.S. Ins. Co. of Waco v. Boyer*, 153 Tex. 415, 418, 269 S.W.2d 340, 341 (1954)).

When an ambiguity involves an exclusionary provision of an insurance policy, a court " 'must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.' " *Balandran*, 972 S.W.2d at 741 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991)). Nevertheless, courts construe a policy exclusion against the insurer in favor of coverage only when con-

struing an ambiguous policy provision. *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir.1998); *see also Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 194 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (stating courts employ doctrine of construing contract term against insurer in favor of coverage, only when construing an ambiguous policy provision).

If a court can give a contract only one reasonable meaning, the contract is not ambiguous and the court will enforce it as written. *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998). In contrast, if a contract is susceptible to two or more reasonable interpretations, it is ambiguous. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). Whether a contract is ambiguous is a question of law for the court to decide by examining the entire contract in light of the existing circumstances at the time the contract was entered. *Id.*

The San Antonio Court of Appeals has explained: "To 'ensue' means 'to follow as a consequence or in chronological succession; to result, as an ensuing conclusion or effect.' An 'ensuing loss,' then, is a loss which follows as a consequence of some preceding event or circumstance." *Lambros v. Standard Fire Ins. Co.*, 530 S.W.2d 138, 141 (Tex.Civ.App.-San Antonio 1975, writ ref'd) (quoting WEBSTER'S NEW INT'L DICTIONARY 852 (2d ed., unabridged, 1959), and citing *McKool v. Reliance Ins. Co.*, 386 S.W.2d 344, 345 (Tex.Civ.App.-Dallas 1965, writ dism'd)).

---

regard, the Lundstroms referred to the "damage caused by both the fire sprinkler system and the overflow drain and scuppers" and argued both of "these systems" were "part of a buildings [sic] plumbing system." As discussed in Part III.A.1, above, however, the

summary judgment proof establishes the May 2000 occurrence and the resulting loss at issue do not involve these systems. We therefore focus instead on the mold exclusion and ensuing loss exception to the exclusion.

In *Lambros,* the court considered facts and policy provisions paralleling those in the present case. The insureds in *Lambros* alleged that damage to their home had been caused by underground water exerting pressure on, or leaking through, various parts of the home. *Id.* at 139. In addition, they alleged loss caused by, and resulting from, "settling, cracking, bulging, shrinkage, expansion of foundations, walls, floors, ceilings, roof structures." *Id.* Underground water was an insured risk because the insureds had paid to have the exclusion for loss from underground water deleted from their policy. *See id.* at 140–41. The policy, however, contained an exclusion, exclusion k, for " 'Loss . . . caused by settling, cracking, bulging, shrinkage, or expansion of foundations, walls, floors, ceilings, roof structures. . . .' " *Id.* at 139. A jury found the insureds' loss was caused by water below the surface of the ground and also by settling, cracking, etc. *Id.* at 140.

Of particular relevance to the present case is the San Antonio court's analysis of whether the ensuing loss exception to exclusion k, rendered that exclusion inapplicable. The ensuing loss exception provided:

> "The foregoing Exclusions a through k shall not apply to ensuing loss caused by fire, smoke or explosion and Exclusions i, j and k shall not apply to ensuing loss caused by collapse of building, or any part thereof, water damage . . ., provided such losses would otherwise be covered under this policy."

*Id.* at 139.

The San Antonio court declined to apply the ensuing loss exception to the settling exclusion. The court assumed the insureds' loss resulted from the action or presence of water beneath the surface, but reasoned:

> [I]t nevertheless cannot be contended that such loss was an "ensuing loss" caused by water damage. Such a conclusion would involve "a backward application of the ensuing loss exception." Such a construction, in effect, reads "ensuing" out of the exception. If we give to the language of the exception its ordinary meaning, we must conclude that an ensuing loss caused by water damage is a loss caused by water damage where the water damage itself is the result of a preceding cause. What is the preceding cause which gives to the exception the effect of taking the ensuing loss out of the reach of exception k? Again, **the plain language of the exception compels the conclusion that the water damage must be a consequence, i.e., follow from or be the result of the types of damage enumerated in exception k.** "Ensuing loss caused by water damage" refers to water damage which is the result, rather than the cause, of "settling, cracking, bulging, shrinkage, or expansion of foundations, walls, floors, ceilings . . . ." Since the evidence in this case, even when viewed in the light most favorable to plaintiffs, conclusively establishes that water damage was the cause, rather than the consequence, of settling, etc., exclusion k is applicable.

*Id.* at 141–42 (emphasis added) (quoting Larry L. Gollaher, *The 1960 Texas Standard Homeowners Policy,* 24 SW. L.J. 636, 651 (1970), and citing *Park v. Hanover Ins. Co.,* 443 S.W.2d 940, 942 (Tex.Civ. App.-Amarillo 1969, no writ)).

*Lambros,* therefore, rests on the premise that the "ensuing loss" is to be understood as a loss that results or follows from the listed excluded risks (wear and tear, deterioration, inherent vice, rust, rot, mold, etc.). *See Coury v. Allstate Lloyd's,* No. H–02–2238, 2004 WL 343946, at *4 (S.D.Tex. Jan.6, 2004) (magistrate's memo-

randum and recommendation) (placing *Lambros* among cases understanding "ensuing loss" to mean losses which ensue from excluded event).

Assuming, without deciding, that rainwater entering through a hole cut by a third party is a covered risk under the Lundstroms' policy, that risk parallels the underground water risk in *Lambros*.[14] The mold exclusion in the Lundstroms' policy parallels the settling exclusion in *Lambros*. Consistent with *Lambros*, for the ensuing loss exception to override the exclusion for mold in the present case, the mold must have caused or preceded the water damage, not vice versa. Because the Texas Supreme Court refused writ in *Lambros*, the opinion in that case has the same precedential value as an opinion of the Supreme Court. TEX.R.APP. P. 56.1. The Lundstroms point to no published, post-*Lambros*, case from Texas holding otherwise, and we have found none.

Courts and commentators cite only three Texas cases as supporting the conclusion that mold damage is covered under the ensuing loss exception: *Allstate Insurance Co. v. Smith*, 450 S.W.2d 957 (Tex. Civ.App.-Waco 1970, no writ); *Employers Casualty Co. v. Holm*, 393 S.W.2d 363 (Tex.Civ.App.-Houston 1965, no writ); and *Home Insurance Co. v. McClain*, No. 05–97–01479–CV, 2000 WL 144115 (Tex.App.-Dallas Feb.10, 2000, no pet.) (not designated for publication). *See Fiess v. State Farm Lloyds*, 392 F.3d 802, 809 n. 28 (citing cases); *Coury*, 2004 WL 343946, at *4 (same); William J. Chriss, *Coverage for Ensuing Water Damage under Texas Property Insurance Policies*, 46 S. TEX. L.REV. 1247, 1265 nn. 58, 59 (2005) (same). *Smith* and *Holm* pre-date *Lambros*.

*McClain*, an unpublished case, is factually very similar to the present case. In *McClain*, rainwater entered the insureds' residence through leaks in a new roof of an addition, as well as leaks in the roof on the previously existing part of the house. 2000 WL 144115, at *1. The insureds sued the builder alleging the builder's work was defective and caused problems in various parts of the house. *Id.* The insureds subsequently discovered the leaking water had collected and soaked the stud areas behind the interior walls, damaging the walls, ceilings and subfloors. *Id.* According to the appellate court, "The rainwater provided an environment for mold and bacteria to grow." *Id.*

The insureds eventually settled with the builder, but the settlement did not reflect any recovery for environmental remediation, move-out, hotel, or rental expenses; and the builder went out of business sixty days after the lawsuit settled. *Id.* The insureds then filed a claim with the insurer to recover their remaining covered damages. The insurer denied the claim based, in part, on the mold exclusion. *Id.* The insureds then sued the insurer to obtain coverage. *Id.* The trial court granted partial summary judgment for the insureds on the issue of the mold exclusion, and the court of appeals affirmed that part of the final judgment. *Id.* at *2, *4.

The court of appeals rejected the insurer's contention that the ensuing loss provision covered only water damage which follows or results from mold or fungus damage and does not cover mold and fungus, even if caused by water damage. *Id.* at *3. The court faulted the insurer's position:

> Home [the insurer] ignores that the ensuing-loss provision is not limited by the

---

14. At oral argument, the Lundstroms' counsel contended the hole in the roof was not a building defect.

mold and fungi exclusion, and, although the water damage was not the result of the mold and fungi, it was the result of the defective and deteriorated roof. Thus, the application of the mold and fungi exclusion is dependent on the application of the ensuing-loss provision.

"Ensuing losses" mean losses which follow or come afterward as a consequence. *See McKool v. Reliance Ins. Co.*, 386 S.W.2d 344, 345 (Tex.Civ.App.-Dallas 1965, writ dism'd). *To be an ensuing loss caused by water damage, the mold and fungi would necessarily have to follow or come afterward as a consequence of the water damage. ...*

Here, the water from the leaking roof pooling in the crawl spaces caused the mold and fungi. The facts are uncontroverted that the damages claimed were a consequence of water leaking from the roof. Both the McClains [insureds] and Home [the insurer] acknowledged these facts in their pleadings, motions for summary judgments, and appellate briefs. Home does not claim the mold and fungi came from another source. Consequently, the loss that followed the water damage was caused by water damage. Therefore, under the facts of this case, the exclusion for fungi and mold damage does not apply.

*Id.* at *3–4 (emphasis added).

Contrary to *Lambros,* the *McClain* court construed "ensuing loss" as meaning to follow an event listed in the ensuing loss provision (water damage) rather than to follow events listed in the exclusions. *See Coury,* 2004 WL 343946, at *4 (placing *McClain* among cases understanding "ensuing loss" to mean losses which ensue from events listed in ensuing loss provision). The *McClain* court also relied heavily on *Holm,* a pre-*Lambros* case.

In the only published post-*Lambros* case, *Zeidan v. State Farm Fire & Casualty Co.*, the court followed *Lambros.* 960 S.W.2d 663, 666 (Tex.App.-El Paso 1997, no writ). The insured in *Zeidan* argued that, as a result of rainstorms, there was a shift in the soil under his residence, and this shift, along with other causes, damaged his residence by collapsing the wall and causing structural damage. *Id.* at 665–66. The El Paso court concluded the insured's reliance on the ensuing loss paragraph was "misplaced because the water damage referred to could not imply the rain water [the insured] claims damaged his residence." *Id.* at 666.

Regardless of whether we agree with *Lambros,* it is on point, and as an intermediate court of appeals, this court is bound to follow established precedent from the Texas Supreme Court. Consideration of any changes to common-law rules must be left to that higher authority. *Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585 (Tex.2002).[15]

---

15. In *Fiess v. State Farm Lloyds,* however, the Fifth Circuit certified the following question to the Texas Supreme Court:

> Does the ensuing loss provision contained in Section I–Exclusions, part 1(f) of the Homeowners Form B (HO–B) insurance policy as prescribed by the Texas Department of Insurance effective July 8, 1992 (Revised January 1, 1996), when read in conjunction with the remainder of the policy, provide coverage for mold contamination caused by water damage that is otherwise covered under the policy?

392 F.3d 802, 811–12 (5th Cir.2004). The Fifth Circuit declined to render judgment based solely on *Lambros* because (1) *Lambros* is 30 years old, (2) it involved a homeowners policy that has subsequently been changed, and (3) the ensuing loss provision at issue has been interpreted by state and federal courts and the Texas Department of Insurance in a manner inconsistent with *Lambros. Id.* at 809 n. 27. The relevant provisions of the two policies are not substantively different, however; and the supreme court has never overruled the *Lambros* court's interpretation of

Under *Lambros*, the mold damage, which followed rather than preceded the water damage in the present case, is excluded from coverage under the Lundstroms' policy. Under the umpire's award, discussed above, the Lundstroms were compensated for their covered loss.

We therefore overrule the Lundstroms' issues three, four, and eight, by which they challenge the effect of the umpire's award and USAA's interpretation of the ensuing loss exception to the mold exclusion.[16] Accordingly, we affirm the summary judgment against the Lundstroms on their breach of contract claims.

### B. Is Summary Judgment Proper on the Lundstroms' Bad–Faith Claims?

In addition to their contractual claims, the Lundstroms asserted claims for violation of the duty of good faith and fair dealing ("bad faith"), violation of the DTPA,[17] and unfair insurance practices.[18] In its summary judgment motion, USAA argued that each of these claims was barred as a matter of law because a good faith dispute existed regarding coverage. USAA specifically referred to a dispute over whether any of the damage was caused by plumbing leaks and observed the Lundstroms were entitled to coverage only if accidental discharge, leakage or overflow of water from within a plumbing, heating or air conditioning system or from a domestic appliance caused the damage.

In addition, USAA moved for summary judgment on no evidence grounds on each of these claims. With regard to the bad faith claim, USAA argued, in part, there was "no evidence to support a claim that USAA denied or delayed payment of a claim at a time when its liability was reasonably clear."

In response, the Lundstroms argued the question of bad faith was a question of fact, not law. The only statements in the Lundstroms' response that even arguably approach factual allegations, however, are the following: (1) USAA's own engineer found damage was caused by leaking plumbing systems, but USAA "stood by its denial of the toxic mold damage"; and (2) when presented with conflicting engineering reports, USAA had the opportunity to have another independent engineer evaluate the residence, but failed to do so.[19] The Lundstroms also claimed the bona fide dispute rule was inapplicable because USAA accepted coverage and made partial payment.

On appeal, the Lundstroms argue USAA "decided the claim was not covered because building defects caused the loss, and no plumbing leak related to the loss. It [USAA] concluded 'any related mold damage' is not covered." The Lundstroms also point to HDR's report, which identified problems with the sprinkler system and with the scupper and downspout. The Lundstroms suggest USAA wrongly de-

---

the ensuing loss provision, an interpretation which has been followed in published Texas case law decided after *Lambros*.

**16.** Accordingly, we need not address the Lundstroms' issue three in which they address an alternative ground on which the trial court could have granted summary judgment. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995).

**17.** *See* TEX. BUS. & COM.CODE ANN. §§ 17.41–.885 (Vernon 2002 & Supp.2005).

**18.** *See* Act of May 19, 1995, 74th Leg., R.S., ch 414, § 11, 1995 Tex. Gen. Laws 2988, 2997–3000 (amended 1995, 2001) (repealed and recodified 2003) (current version at TEX. INS.CODE ANN. § 542.003 (Vernon Supp.2005)).

**19.** Despite suggesting All–Around Plumbing, HDR, and Casteel were biased, the Lundstroms point to no summary judgment proof to support such a claim.

nied the claim "when its own report show[ed] coverage, the insured point[ed] this fact out in writing, and no plausible reason [was] articulated to support the insurer's conclusion of 'no coverage.'"

USAA's written notice denying the claim is not part of the summary judgment proof. Moreover, as discussed in Part III.A.1., above, in an apparent attempt to avoid USAA's charge of untimely notice, the Lundstroms have narrowed their claim to one for the loss resulting from the May 2000 rainstorm.[20] That loss involved alleged damage from the initial water intrusion through the hole in the fourth floor patio/roof and the subsequent development of mold. Pursuant to the appraisal process, USAA paid the Lundstroms for damage occurring during the initial water intrusion; USAA disputed coverage for mold damage.

▮▮▮▮▮ An insurer breaches its duty of good faith and fair dealing by denying or delaying payment of a claim if the insurer knew or should have known it was reasonably clear the claim was covered. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 49 (Tex.1997). Conversely, there can be no claim for bad faith when an insurer has denied a claim that is, in fact, not covered and has not otherwise breached the contract. *Betco Scaffolds Co. v. Houston United Cas. Ins. Co.,* 29 S.W.3d 341, 348 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *accord Tivoli Corp. v. Jewelers Mut. Ins. Co.,* 932 S.W.2d 704, 712 (Tex. App.-San Antonio 1996, writ denied) (holding extra-contractual claims fail when denial of a claim is held to be appropriate).

However, this principle does not exclude the possibility that, in denying the claim, the insurer may have committed an act so extreme as to cause injury independent of the policy claim. *Betco Scaffolds Co.,* 29 S.W.3d at 348. It also does not change established principles regarding the duty of an insurer to timely investigate its insureds' claims. *Id.*

In Part III.A.2.b., above, we held that the Lundstroms' policy did not cover mold damage under the facts alleged here. The Lundstroms have not alleged any act so extreme as to cause an injury independent of USAA's denial of their policy claim. Accordingly, the Lundstroms' bad faith claim fails as a matter of law.

Based on our review of the Lundstroms' pleadings and summary judgment arguments, we conclude their DTPA and unfair insurance practices claims arose from the same underlying theory as did their bad faith claim: USAA allegedly denied or delayed paying benefits under the policy when, based on its investigation, its liability allegedly was reasonably clear. In conclusively disproving the bad faith claim, USAA therefore also conclusively disproved those claims. *See State Farm Fire & Cas. Co. v. Woods,* 925 F.Supp. 1174, 1180 (E.D.Tex.1996), *aff'd,* 129 F.3d 607 (5th Cir.1997); *see also Carter v. State Farm Mut. Auto. Ins. Co.,* 33 S.W.3d 369, 373 (Tex.App.-Fort Worth 2000, no pet.) (stating, when claims under DTPA and Insurance Code do nothing more than recharacterize a bad faith claim, defense to

---

**20.** Even if damage allegedly resulting from the sprinkler system and the blocked scupper and downspout were part of the Lundstroms' claim, USAA had a reasonable basis on which to dispute coverage based on whether either constituted a "plumbing system." *See Harrison v. U.S.A.A. Ins. Co.,* No. 03–00–00362–CV, 2001 WL 391539, at *3 (Tex.App.-Austin, April 19, 2001, no pet.) (not designated for publication) (stating, "Plumbing serves the essential purpose of supplying and recirculating water and sewage and about a building," and "Typically, a building's plumbing system is considered to be the build-in network of pipes, fixtures, appurtenances and appliances used for that purpose.").

the bad faith claim serves to defeat statutory claims).

We overrule the Lundstroms' issues five and six, by which they challenge the summary judgment against them on their claims for violation of the duty of good faith and fair dealing ("bad faith"), violation of the Deceptive Trade Practices Act (DTPA), and unfair insurance practices. Accordingly, we affirm the summary judgment against the Lundstroms on those claims.

### C. Is Summary Judgment Proper on the Lundstroms' Claim under Former Article 21.55?

■ Finally, the Lundstroms contend the trial court erroneously granted summary judgment against them on their claim under former Insurance Code article 21.55, relating to prompt payment of claims.[21] In their petition, the Lundstroms alleged USAA violated article 21.55 by (1) failing, within fifteen days after receipt of notice of the Lundstroms' water loss claim, to request any items, statements, and forms reasonably believed to be required, (2) failing, within thirty-six days after receipt of notice of the claim, to accept or reject the claim in writing, and (3) failing, within sixty-days after receipt of notice of the claim, to pay the claim.[22]

USAA moved only for no-evidence summary judgment on the Lundstroms' article 21.55 claim. After setting forth the elements of an article 21.55 claim, USAA stated, "Because Plaintiffs cannot establish that the claim at issue is a claim for which USAA is liable, Plaintiffs have not and cannot demonstrate that USAA is liable for violating Article 21.55."[23] USAA also argued, "Plaintiffs have not and cannot establish or put forth any evidence that USAA violated any subpart of Article 21.55."[24]

In their response, the Lundstroms recited the article 21.55 provisions and related case law. They did not, however, direct the trial court to any summary judgment proof in support of their article 21.55 claim.

On appeal, the Lundstroms allege: "The evidence shows the Lundstroms notified USAA of the loss in May of 2000, and it was not until April 11, 2001, that USAA's agent, HDR Engineering, Inc., commenced its investigation of the premises." They further allege, "After the HDR report issued, and a year and two months after the loss, USAA improperly denied the claim on July 17, 2001." In support of both allegations, the Lundstroms cite only Vonnie Lundstrom's October 26, 2001 letter to USAA in which she states:

21. *See* Act of May 27, 1991, 72nd Leg., R.S., ch 242, § 11.03, art. 21.55, 1991 Tex. Gen. Laws 939, 1043–45 (repealed and recodified 2003) (current version at Tex. Ins.Code Ann. § 542.055 (Vernon Supp.2005)).

22. *See id.* art. 21.55, secs. 2(a)(1), 3(a), (f).

23. *See Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex.2001) (stating, to successfully maintain claim under article 21.55, section 6, party must establish the following elements: (1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to follow one or

more sections of article 21.55 with respect to the claim).

24. The Lundstroms complain in passing that USAA's no evidence challenge to their article 21.55 claim was "impermissibly vague." USAA, however, set forth each of the elements for which it contended the Lundstroms had not produced, and could not produce, any evidence. *See Cuyler v. Minns*, 60 S.W.3d 209, 212 (Tex. App.-Houston [14th Dist.] 2001, pet. denied) (reiterating rule 166a(i)'s requirement that motion must be specific in challenging the evidentiary support for an element of a claim or defense).

Your letter dated July 17, 2001 states "[o]ur investigation of the damages concluded that building defects or practices of your builder caused the damages to your home." The letter further states: "[s]ince there was no plumbing leak related to this loss, your policy does not cover any related mold damages originating from the construction of the building." USAA's analysis is incorrect, and neither of these statements provides any basis for denial of our claim.

To recap the history of this claim, which was initially reported approximately a year and a half ago, in May 2000, I refer you to my April 10, 2001 letter which is attached hereto as Exhibit "A." Commencing on April 11, 2001, HDR Engineering conducted a series of inspections of the townhome at USAA's direction. Over two months later, on June 21, 2001, HDR submitted the report of its findings to USAA ("the HDR Report"). USAA's denial letter was dated July 17, 2001, 26 days after HDR's June 21, 2001 report and over three months since HDR first began its inspections. The July 17, 2001 letter was the first and only written indication, since this claim was made over a year earlier, that USAA was denying coverage for any part of our claim.

The April 11, 2001 letter is not part of the summary judgment proof.

Under Texas Rule of Civil Procedure 166a(i), a trial court must grant a no-evidence motion unless the respondent produces summary judgment proof raising a fact issue. TEX.R. CIV. P. 166a(i). The respondents are not required to marshal their proof. TEX.R. CIV. P. 166a cmt. to 1997 change. Nevertheless, they must point out evidence raising a fact issue on the challenged elements. *Id.*

Although the Lundstroms attached ten exhibits, comprising over 250 pages, to their response, they did not, in their response, point to any evidence as raising a fact issue on their claim under article 21.55. On this basis alone, we may hold the Lundstroms failed to meet the requirements of Rule 166a(i) for raising a fact issue. *See, e.g., Cmty. Initiatives, Inc. v. Chase Bank of Tex.*, 153 S.W.3d 270, 282 (Tex.App.-El Paso 2004, no pet.) (stating, in tortuous interference of contract case, failure to direct trial court to any evidence of consideration for purported contract alone would support summary judgment on this cause of action); *see also Nicholson v. Naficy*, 747 S.W.2d 3, 4 n. 1 (Tex.App.-Houston [1st Dist.] 1987, no writ) (refusing to consider portion of deposition attached to motion for traditional summary judgment, but not cited, quoted, or otherwise pointed out to trial court).

Even if we consider the summary judgment proof cited in the Lundstroms' appellate brief, however, we conclude it is insufficient to raise a fact issue regarding a violation of article 21.55. Although Vonnie Lundstrom's letter refers to the alleged dates the Lundstroms notified USAA of their claim, the dates of the inspection, and the date of the denial, the letter provides no evidence that the claim at issue is a claim for which USAA is liable. *See Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex.2001) (stating, to successfully maintain article 21.55 claim, party must establish insurer is liable for a claim under an insurance policy).

We therefore overrule the Lundstroms' issue seven, by which they challenge the summary judgment against them on their claim under former Texas Insurance Code article 21.55. Accordingly we affirm the judgment against the Lundstroms on that claim.

## IV. CONCLUSION

As stated, we have construed the Lundstroms' claim as being for the loss that

resulted from the May 2000 rainstorm and conclude the Lundstroms timely gave USAA notice of that claim. Under *Lambros,* we further conclude that any mold damage ensuing from that loss was not covered by the Lundstroms' homeowner's policy and the amount of damage occurring at the time of the initial May 2000 wetting was resolved in binding arbitration. We therefore hold the trial court properly granted summary judgment in favor of USAA on the Lundstroms' breach of contract claims.

We conclude the Lundstroms' bad faith claim fails as a matter of law, and USAA also conclusively disproved the Lundstroms' DTPA and unfair insurance practices claim. We further conclude the Lundstroms failed to raise a fact issue regarding their alleged violation of article 21.55. We therefore hold the trial court properly granted summary judgment in favor of USAA on the Lundstroms' bad-faith and article 21.55 claims.

We therefore overrule the Lundstroms' issue one, by which they challenge the summary judgment generally. Accordingly, we affirm the judgment of the trial court.