Opinion issued July 31, 2008 
















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00897-CV

__________


TEXAS MUTUAL INSURANCE COMPANY, Appellant


V.


TIMOTHY J. RUTTIGER, Appellee






On Appeal from the 122nd District Court

Galveston County, Texas

Trial Court Cause No. 05-CV-0796






OPINION ON REHEARING

 We grant appellant's motion for rehearing. See Tex. R. App. P. 49.3. We
withdraw our January 17, 2008 opinion, substitute this opinion in its place, and vacate
our January 17, 2008 judgment.

 Appellant, Texas Mutual Insurance Company ("TMI"), challenges the trial
court's judgment, entered after a jury trial, in favor of appellee, Timothy J. Ruttiger,
in Ruttiger's suit for violations of the Texas Insurance Code, (1) breach of the duty of
good faith and fair dealing, and violations of the Texas Deceptive Trade Practices
Act ("DTPA"). (2)
 TMI brings eight issues for our review. In its first three issues, TMI
contends that the evidence is legally insufficient to support the jury's findings that
TMI violated the Insurance Code by engaging in unfair and deceptive acts or
practices, breached the common law duty of good faith and fair dealing, violated the
DTPA, and "knowingly" engaged in unfair and deceptive acts or practices. In its
fourth, fifth, and sixth issues, TMI contends that the trial court erred in awarding
damages for physical pain and suffering, physical impairment, and mental anguish as
"such damages were not separate and independent from the underlying physical
injury" and that the evidence is legally insufficient to support the awards for mental
anguish and loss of credit reputation. In its seventh issue, TMI contends that the trial
court lacked jurisdiction to award damages because Ruttiger "failed to obtain a
finding by the Texas Workers' Compensation Commission [("TWCC")] that he was
entitled to workers' compensation benefits." In its eighth issue, TMI contends that
no cause of action exists in Texas for breach of the duty of good faith and fair dealing
in the context of a workers' compensation claim. 

 We modify the judgment to delete that portion of the judgment awarding
Ruttiger damages for his loss of credit reputation. We affirm the judgment of the trial
court as modified. Factual and Procedural Background

 In his petition, Ruttiger alleged that, on June 21, 2004, he sustained bilateral
inguinal hernias (3) after lifting a heavy bundle of metal conduit while working as an
employee of A&H Electric Company ("A&H"). He further alleged that TMI, A&H's
workers' compensation carrier, denied him timely payment of benefits and necessary
medical treatment without a reasonable basis "until finally agreeing to do so, much
later in a 'Benefit Dispute Agreement.'" Ruttiger contended that an unbiased
investigation "would have confirmed" that he sustained his injuries in the workplace
and TMI's wrongful and unreasonable delay in paying medical and income benefits
caused him substantial financial hardship and medical problems. Ruttiger attached
to his petition a copy of the January 6, 2005 Benefit Dispute Agreement, wherein
TMI agreed that Ruttiger sustained a compensable injury in the form of a hernia and
that Ruttiger suffered a disability for a specific period of time. (4) 

 At the conclusion of trial, the jury found that TMI failed to comply with its
duty of good faith and fair dealing, engaged in unfair and deceptive acts or practices,
and engaged in these acts and practices knowingly. The jury awarded Ruttiger
$37,500 for past physical pain and suffering, $5,000 for future physical pain and
suffering, $11,500 for past damage to credit reputation, $5,000 for future damage to
credit reputation, $4,500 for past physical impairment, $100,000 for past mental
anguish, and $20,000 in additional damages based on its finding that TMI's conduct
was committed knowingly. (5) The trial court rendered judgment in Ruttiger's favor on
his Texas Insurance Code theory of liability, awarded Ruttiger $163,500 in actual
damages and $20,000 in additional damages, and stated that in the event the
Insurance Code theory failed on appeal, Ruttiger could "elect to recover his damages
under the common law for breach of the duty of good faith and fair dealing and/or
under the [DTPA]."

Jurisdiction

 In its seventh issue, TMI argues that the trial court lacked subject matter
jurisdiction because Ruttiger "failed to obtain a finding by the [TWCC] that he was
entitled to workers' compensation benefits." It asserts that Texas courts have no
jurisdiction to award damages against an insurer for a "denial in payment of
compensation benefits without a determination by the TWCC that such benefits [are]
due." TMI contends that the Benefit Dispute Agreement was merely a compromise,
not a determination by the TWCC as to whether Ruttiger was entitled to workers'
compensation benefits, and treating it as a TWCC determination would permit "the
parties to create subject matter jurisdiction" and would result in a "chilling effect" on
settlements.

 This Court has previously considered, and rejected, similar arguments. In In
re Texas Workers' Compensation Insurance Fund, a claimant sustained an injury in
the course and scope of his employment, and the workers' compensation carrier
initially paid him medical and income benefits. 995 S.W.2d 335, 335 (Tex.
App.--Houston [1st Dist.] 1999, no pet.). The parties then entered into their first
benefit dispute agreement, agreeing that certain medical problems were "causally
related" and that the insurer would pay "reasonable and necessary medical." Id. at
336. However, the insurer subsequently began denying payments, and the parties
entered into two additional benefit dispute agreements, with the insurer agreeing to
pay the claimant supplemental income benefits for specific amounts. Id. Prior to
entering into the third agreement, the claimant sued the insurer, alleging that the
insurer failed to timely pay the benefits that it had agreed to pay. Id. The insurer
argued that the claimant failed to exhaust his administrative remedies. Id. We
disagreed. Id.

 We noted that the Texas Workers' Compensation Act (the "Act") (6) provides a
four-tier system for the disposition of claims by the TWCC. See id. at 336-37. In the
first tier, the parties participate in a "benefit review conference" conducted by a
"benefit review officer." Tex. Lab. Code Ann. §§ 410.021-.034 (Vernon 2006 &
Supp. 2007). The conference, which is a "nonadversarial, informal dispute resolution
proceeding," is designed to "mediate and resolve disputed issues by agreement of the
parties." Id. § 410.021(3) (Vernon 2006) (emphasis added). In the second tier, "[i]f
issues remain unresolved after a benefit review conference, the parties, by agreement,
may elect to engage in arbitration," and, absent an agreement, a party is entitled to
seek relief at a contested case hearing. Id. §§ 410.104, 410.151-.169 (Vernon 2006
& Supp. 2007) (emphasis added). In the third tier, a party may seek review by an
administrative appeals panel. Id. §§ 410.201-.208 (Vernon 2006 & Supp. 2007). 
Finally, in the fourth tier, an aggrieved party may seek judicial review. Id. §§
410.251-.308 (Vernon 2006 & Supp. 2007).

 The statutory scheme specifically provides that "the division shall schedule a
contested case hearing . . . if the disputed issues are not resolved at the benefit review
conference." Id. § 410.025 (Vernon 2006) (emphasis added). Furthermore, "[a]
dispute may be resolved in whole or in part at a benefit review conference," and,
following the conclusion of the benefit review conference, the benefit review officer
shall reduce the agreement to writing to be signed by the officer and each party. Id.
§ 410.029(a) (Vernon 2006). This agreement "is binding on the insurance carrier
through the conclusion of all matters relating to the claim, unless the commission or
a court, on a finding of fraud, newly discovered evidence, or other good or sufficient
cause, relieves the insurance carrier of the effect of the agreement." Id. § 410.030(a)
(Vernon 2006) (emphasis added). "If a dispute is not entirely resolved . . . , the
benefit review officer shall prepare a written report that details each issue that is not
resolved at the conference." Id. § 410.031(a) (Vernon 2006) (emphasis added).

 Under the plain language of the Act, the TWCC, the claimant, and the
insurance provider can enter into a binding written agreement that resolves all
disputed issues. The Act does not require a claimant, who has entered into a binding
written agreement to settle his benefits dispute, to continue through all four tiers of
the disposition process. See In re Texas Workers' Compensation Ins. Fund, 995
S.W.2d at 336-37. (7) 

 Here, the parties signed the Benefit Dispute Agreement, agreeing that Ruttiger
sustained a compensable injury in the form of a hernia on June 21, 2004 and suffered
from a disability for a certain time. The Benefit Dispute Agreement provided that it
"shall be complied with within five days of the approved agreement being received
by the carrier." Accordingly, we hold that the Benefit Dispute Agreement constituted
a final determination that benefits were due to Ruttiger and that the trial court had
subject matter jurisdiction to hear Ruttiger's case. 

 In support of its argument that the trial court did not have subject matter
jurisdiction, TMI relies on American Motorists Insurance Company v. Fodge, 63
S.W.3d 801 (Tex. 2001). However, Fodge is substantively distinguishable. In
Fodge, the carrier initially denied the claimant compensation benefits. Id. at 802. 
However, after an officer at a contested case hearing found that Fodge had suffered
a compensable injury, she and the carrier stipulated that her disability lasted 20 days,
the hearing officer ordered payment of temporary income benefits, and the carrier
complied. Id. Fodge never sought or complained about the carrier's denial of
medical benefits. Id. She then sued the carrier, alleging that the carrier had denied
and delayed payment for medical benefits, had underpaid and delayed payment of the
awarded income benefits, and had failed to pay her additional income benefits that
were never awarded. Id. The carrier filed a motion to dismiss, arguing that the claims
were based on a denial of benefits that only the TWCC has jurisdiction to award. Id.
at 803.

 The Texas Supreme Court held that, regarding Fodge's claims for "benefits
due" and for damages caused by the insurer's bad faith "denial" of additional benefits
never awarded, her "failure to obtain a commission ruling entitling her to [those]
benefits [was] dispostive." Id. Because the TWCC had paid Fodge all of the
benefits awarded to her under the agreement, the trial court had no jurisdiction to hear
her claims for additional benefits or for damages caused by a bad faith denial of
additional benefits. Id. at 804. The court explained that because "only the [TWCC]
can determine a claimant's entitlement" to benefits, allowing courts to award damages
for wrongful deprivation of benefits to which a claimant was not entitled "would
circumvent the [TWCC's] jurisdiction." Id. However, regarding the claims for the
carrier's bad faith delay in the payment of compensation benefits ultimately stipulated
to by the carrier, the court concluded that they were "ripe for adjudication and should
not have been dismissed." Id. at 805. Similar to these "ripe" claims in Fodge,
Ruttiger has alleged that TMI committed bad faith in delaying payment of benefits
that it ultimately agreed to pay in the Benefit Dispute Agreement. Thus, a careful
reading of Fodge supports our holding that the trial court had subject matter
jurisdiction to hear the instant claims. (8)

 We overrule TMI's seventh issue.Insurance Code Violations

 In its first issue, TMI argues that the evidence is legally insufficient to support
the jury's finding that TMI violated the Texas Insurance Code by engaging in unfair
and deceptive acts or practices because the facts "conclusively prove that TMI had
a reasonable basis to dispute Ruttiger's claim, and there is no evidence that a
reasonable insurer would have concluded, based on all the information available, that
coverage was reasonably clear."

 Because TMI did not have the burden of proof at trial, it must demonstrate that
there is no evidence to support the jury's adverse finding. Scottsdale Ins. Co. v. Nat'l
Emergency Servs., Inc., 175 S.W.3d 284, 300 (Tex. App.--Houston [1st Dist.] 2004,
pet. denied). If more than a scintilla of evidence supports the finding, the
no-evidence challenge fails. Tarrant Reg'l Water Dist. v. Gragg, 151 S.W.3d 546,
552 (Tex. 2004). "More than a scintilla of evidence exists where the evidence
supporting the finding, as a whole, rises to a level that would enable reasonable and
fair-minded people to differ in their conclusions." Id. We will sustain a legal
sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a
complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court
from giving weight to the only evidence offered to prove a vital fact, (3) the evidence
offered to prove a vital fact is no more than a scintilla, or (4) the evidence
conclusively establishes the opposite of the vital fact. City of Keller v. Wilson, 168
S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review, a court must
consider evidence in the light most favorable to the verdict and indulge every
reasonable inference that would support it. Id. at 822. If the evidence allows only one
inference, neither jurors nor the reviewing court may disregard it. Id. However, if
the evidence at trial would enable reasonable and fair-minded people to differ in their
conclusions, then jurors must be allowed to do so. Id. A reviewing court cannot
substitute its judgment for that of the trier-of-fact, so long as the evidence falls within
this zone of reasonable disagreement. Id.

 In accordance with sections 541.060 and 541.061 of the Insurance Code, (9) the
trial court, in question number 2, asked the jury whether TMI engaged in any of the
following unfair and deceptive acts or practices: 

(1) making any misrepresentation of an insurance policy by (a)
making an untrue statement of fact; (10) (b) failing to state a material
fact that is necessary to make other statements not misleading,
considering the circumstances under which the statements were
made; (11) or (c) making any statement in such a manner as to
mislead a reasonably prudent person to a false conclusion of a
material fact; (12) or 


(2) engaging in the following unfair settlement practices with respect
to a claim by an insured by (a) misrepresenting to a claimant a
material fact or policy provision; (13) (b) failing to attempt in good
faith to effectuate a prompt, fair, and equitable settlement of a
claim with respect to which the insurer's liability has become
reasonably clear; (14) (c) failing to adopt and implement reasonable
standards for prompt investigation of claims arising under its
policies; (15) (d) failing to provide promptly to a policyholder a
reasonable explanation of the basis of the policy, in relation to the
facts or applicable law, for the insurer's denial of a claim or for
the offer of a compromise settlement of a claim; (16) or (e) refusing
to pay a claim without conducting a reasonable investigation with
respect to that claim. (17) 


The jury answered "yes" to this single, broad-form question. On appeal, TMI
challenges the legal sufficiency of the evidence supporting the jury's affirmative
findings on all theories. 

 TMI first contends that there is no evidence that it failed to attempt in good
faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to
which its liability had become reasonably clear and that it refused to pay a claim
without conducting a reasonable investigation. See Tex. Ins. Code Ann.
§ 541.060(a)(2), (a)(7). TMI asserts that the evidence "conclusively shows" that it
had "powerful reasons to dispute [Ruttiger's] claim." Ruttiger responds that TMI
"had no objective evidence" to support its denial of his claim.

 In addition to committing an unfair and deceptive act by violating subsections
(a)(2) and (a)(7) of section 541.060, an insurer breaches its duty of good faith and fair
dealing by denying or delaying payment of a claim if the insurer knew or should have
known it was reasonably clear the claim was covered. Universe Life Ins. Co. v. Giles,
950 S.W.2d 48, 49 (Tex. 1997); see also Travelers Personal Sec. Ins. Co. v.
McClelland, 189 S.W.3d 846, 852 (Tex. App.--Houston [1st Dist.] 2006, no pet.)
(stating that, under Insurance Code, "insurer violates its duty of good faith and fair
dealing by denying or delaying payment of a claim when the insurer knew or should
have known that it was reasonably clear that the claim was covered" and that "an
insurer cannot shield itself from bad-faith liability by investigating a claim in a
manner calculated to construct a pretextual basis for denying a claim"); Lundstrom
v. United Servs. Auto. Ass'n-CIC, 192 S.W.3d 78, 96 (Tex. App.--Houston [14th
Dist.] 2006, pet. denied) (same); United Servs. Auto. Ass'n v. Croft, 175 S.W.3d 457,
471-72 (Tex. App.--Dallas 2005, no pet.) ("The common-law duty of good faith and
fair dealing is breached when an insurer denies or delays payment of a claim after its
liability has become reasonably clear."). (18) 

 As part of its common law duty, and as codified in the Insurance Code, an
insurer has an obligation to conduct an adequate investigation before denying a claim. 
Croft, 175 S.W.3d at 472 (citing State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 449
(Tex. 1997)). "An insurer will not escape liability merely by failing to investigate a
claim so that it can contend that liability was never reasonably clear." Giles, 950
S.W.2d at 56 n.5. However, an insurer does not act in bad faith when a reasonable
investigation reveals the claim is questionable, and an insurer maintains the right to
deny questionable claims without being subject to liability for the erroneous denial
of the claim. Croft, 175 S.W.3d at 471 (citing Aranda v. Ins. Co. of N. Am., 748
S.W.2d 210, 213 (Tex. 1988)). A bona fide dispute about the insurer's liability on the
contract does not rise to the level of bad faith. Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 17 (Tex. 1994). Finally, there can be no claim for bad faith when an insurer has
denied a claim that is, in fact, not covered and the insurer has not otherwise breached
the contract. Lundstrom, 192 S.W.3d at 96.

 The Texas Supreme Court has recently highlighted the appropriate legal
sufficiency standard of review to be applied in insurance bad-faith cases. See
Minnesota Life Ins. Co. v. Vasquez, 192 S.W.3d 774, 777 (Tex. 2006). The court
explained that, in such cases, coverage will "almost always be reasonably clear if
reviewing courts must disregard all evidence that [coverage] was unclear." Id. Thus,
appellate courts should "look at all the evidence in such cases, crediting favorable
evidence if reasonable jurors could, and disregarding contrary evidence unless
reasonable jurors could not." Id.

 Here, the parties agree that once TMI began paying Ruttiger temporary benefits
in late June 2004, TMI had secured 60 days from the date that it was notified of
Ruttiger's injury to continue to investigate or deny him compensation for his injuries. 
See Tex. Lab. Code Ann. § 409.021 (Vernon Supp. 2007). Beyond this, most of
the critical facts are hotly contested. 

 Ruttiger testified that, during the weekend prior to his injury, he coached at his
daughter's softball tournament and that he suffered no pains or problems. On June
21, 2004, he returned to work, and he and his supervisor, David Martin, went to a
jobsite. Ruttiger picked up a load of metal conduit, weighing approximately 40-50
pounds, and stumbled over a board in a doorway. The load shifted, and Ruttiger
immediately felt burning pain. Ruttiger told Martin "what happened" and that he
needed medical attention. After Martin told Ruttiger that they could not leave the job
site, Ruttiger arranged for his wife to take him to the University of Texas Medical
Branch-Galveston ("UTMB"). There, Dr. Pamela Havlen, who had an immediate
opening, examined Ruttiger and diagnosed him as suffering from two hernias, "one
on each side." 

 When a nurse asked Ruttiger about payment, he called A&H and spoke with
April Beall, A&H's owner, and she told him to "file it on Workers' Comp." She also
gave him a policy number to provide to the nurse. Pursuant to Beall's instructions,
Ruttiger stopped by A&H's office on his way home and filled out a form entitled
"Employer's First Report of Injury or Illness." Ruttiger wrote in the form that he was
injured "carrying heavy pipes to a jobsite." Ruttiger also identified his doctor as 
"Dr. William Harper, UTMB." Beall signed the form in Ruttiger's presence. 

 Dr. Havlen referred Ruttiger to Dr. Thomas Kimbrough, and, on July 2, 2004,
Kimbrough examined Ruttiger. In his notes, Kimbrough wrote that Ruttiger "was
carrying pipe at work," stumbled and felt a burning pain on his left side,"noticed a
bulge on that side," "sought medical attention," " and was discovered to [also] have
a smaller bulge on the right." Kimbrough also noted that Ruttiger's "left side is still
tender," he "has not ever had bulges in this area prior to his accident at work," and
he has had no previous operations. Kimbrough detailed Ruttiger's symptoms,
diagnosed him with bilateral inguinal hernias, and scheduled surgery for July 14,
2004.

 Ruttiger further testified that after Dr. Kimbrough's examination, neither A&H
nor TMI contacted him further and he did not anticipate any problems with receiving
his benefits. However, shortly before his scheduled surgery, Kimbrough's office
called him and told him that TMI had "cancelled everything." Ruttiger then made a
telephone call to TMI and spoke with Audie Culbert, the TMI adjuster assigned to
Ruttiger's case. During this conversation, Culbert told Ruttiger that TMI cancelled
his benefits because Ruttiger "was hurt playing softball and not hurt on the job." 
Ruttiger tried to explain to Culbert that he did not play softball and, instead, only
coached his daughter's team. Ruttiger maintained that he was "hurt on the job," and
Culbert replied, "that's not what I'm hearing," and hung up the telephone. No one
from TMI contacted Ruttiger again, and Ruttiger, who remained "sore and swollen,"
hired a lawyer. 

 In contrast, Culbert testified that after receiving the claim, he, on June 28,
2004, contacted April Beall, and "she had a lot of questions about this claim." 
Although Ruttiger had completed the injury report form at A&H's office on the day
of his injury, Beall told Culbert that Ruttiger had not reported an on-the-job injury. 
Beall also stated that Ruttiger had taken off work on June 17-18, 2004 to go to a
softball game. She told Culbert that Henry Beall, her relative and an A&H employee,
had told her that Ruttiger came to work on June 21, 2004 limping, and David Martin,
Ruttiger's supervisor, told her that he "was never told of any accident." April Beall
claimed that Ruttiger was not at work on a regular basis, and she did not believe
Ruttiger was injured on the job. Culbert wrote in his notes that Ruttiger was
"allegedly carrying some heavy pipes," and identified the "compensable injury" as
a "possible hernia." 

 That same day, Culbert unsuccessfully attempted to contact Ruttiger twice at
a phone number provided by A&H, he sent Ruttiger a letter requesting that Ruttiger
contact him at a 1-800 number, and he attempted to contact Dr. William Harper at
UTMB, the doctor identified on Ruttiger's injury report form. Culbert wrote in his
notes, "I will try to get [Harper's telephone number] from employee once I speak with
him." According to Culbert, Ruttiger never responded to his contact attempts.

 Culbert further testified that, on July 7, 2004, he spoke with Henry Beall and
recorded his statement, which was the only recorded statement Culbert obtained
during his investigation prior to TMI's filing of its notice disputing Ruttiger's claim. 
In his statement, contrary to April Beall's previous representations, Henry Beall
agreed that Ruttiger had informed both him and Martin that he had been injured on
the job. However, Henry Beall subsequently contradicted himself in the same
statement, claiming that Ruttiger had not reported any accident "on the job" and that
Ruttiger did not follow proper procedure. In regard to the softball game, Henry Beall
stated that he was not "totally positive" as to whether Ruttiger had been playing
softball or coaching his daughter's team. Henry Beall conceded that he did not "have
verification" about the softball game. In regard to whether Ruttiger arrived at work
on June 21, 2004 with a limp, Henry Beall was not "100%" sure and "couldn't say he
was actually limping." During the statement, Culbert specifically asked Henry Beall
if he had the name of Ruttiger's doctor. After referring to a letter in his possession,
Henry Beall supplied Culbert with the name of Ruttiger's doctor. (19) The record does
not indicate that Culbert ever made any attempt to contact this doctor, nor whether
Culbert even asked Henry Beall for a copy of the letter.

 Culbert, on July 8, 2004, again spoke with April Beall, who repeated that one
of Ruttiger's co-workers told her that Ruttiger got hurt playing softball and that
Ruttiger had "bragged about getting it paid by Worker's Compensation." She stated
that this co-worker would provide Culbert with a recorded statement on July 9, 2004. 
However, Culbert did not take any recorded statements on July 9, 2004. On July 12,
2004, Culbert again spoke with April Beall, and she reiterated that Ruttiger had
played softball on June 20, 2004, "and then came to work and claimed he was
injured." She also told Culbert that Ruttiger had told his co-worker, "Adam," that he
"was happy that he was getting his hernia repaired by Woker's
Compensation/employer." 

 On July 12, 2004, UTMB contacted Culbert seeking preauthorization for
Ruttiger's surgery. During this call, Culbert agreed that he did not ask UTMB for any
medical records and did not ask for the names of any of Ruttiger's doctors. Culbert
informed the UTMB representative that Ruttiger's claim had been disputed because
Ruttiger had been injured playing softball and not at work. (20) That same day, Culbert
filed a "Notice of Refused or Disputed Claim," stating,

 The carrier disputes this claim in its entirety. The claimant did not
sustain a compensable injury. The claimant did not sustain an injury in
the course and scope of employment. Our investigation revealed that the
[employee] was playing softball and sustained a hernia.


 Despite his affirmative statements in this notice, Culbert, on cross-examination,
conceded that no one ever actually saw Ruttiger playing softball and Henry Beall,
who had provided the only recorded statement to date and who was the alleged source
of the softball story, agreed that Ruttiger may have simply coached his daughter's
team. Culbert also agreed that "a very basic rule" of conducting an investigation is
to use the "three point contact," meaning that Culbert was required to contact
Ruttiger, his employer, and his doctor. As an experienced adjuster, Culbert was
aware that employers had financial motivations for classifying injuries as occurring
off-the-job and that adjusters should be aware of these motivations. Yet, Culbert
conceded that the only information upon which he relied in disputing Ruttiger's claim
was information that he received from A&H, he did not speak with Ruttiger or his
treating physicians, and he did not see or request any of Ruttiger's medical records. 
 Although Culbert maintained that he tried to contact Ruttiger twice by 
telephone, Ruttiger testified that no one from TMI had ever contacted him by
telephone and that his phone number remained active "24 hours a day and 7 days a
week" during that time period. Also, although Culbert stated that he sent Ruttiger a
letter, Ruttiger denied receiving any letter from Culbert. Moreover, although Culbert
vigorously denied refusing to speak with Ruttiger, Ruttiger testified that when he,
after learning of TMI's dispute, called Culbert to explain his side of the story, Culbert
immediately rejected his explanation and abruptly hung up on him. 

 In regard to Culbert's efforts to obtain the names of Ruttiger's treating doctors
and medical information, Culbert stated that he "had the wrong doctor's name" and
that A&H did not have any accurate medical information. The evidence established
that Ruttiger identified Dr. Harper as his treating physician on his injury report
form. (21) Contrary to TMI's claims that Ruttiger was seeking to deliberately conceal
the identity of his treating doctor, Ruttiger explained that he listed Dr. Harper on the
injury report form because he had seen him on other occasions and that he only saw
Dr. Havlen on the day of the injury because he needed immediate help. 

 Culbert stated that his effort to locate Dr. Harper consisted of looking on the
Internet, and Culbert agreed that he did not contact UTMB directly and did not send
any medical record requests to UTMB. When Culbert received a telephone call from
UTMB seeking preauthorization for Ruttiger's surgery, Culbert made no inquiries
about the names of the treating doctors, the extent of Ruttiger's injuries, or Ruttiger's
contact information. Although Culbert defended his lack of investigation, stating that
he needed Ruttiger's medical authorization to obtain medical information, he, under
further questioning, appeared to equivocate on this defense. 

 To the extent that, in some circumstances, an insurer might be justified in
relying solely upon information obtained from an employer, a reasonable juror could
have believed that, under the circumstances presented in this case, Culbert should
have been highly suspect of the veracity of the unsubstantiated allegations he was
hearing from April Beall at A&H. For example, she suggested in her first contact
with Culbert that Ruttiger never reported an on-the-job injury. Yet, this
representation was flatly contradicted by the injury report form filled out by Ruttiger,
signed by April Beall, and provided to Culbert. April Beall's repeated allegations
that Ruttiger was injured in a softball game, which served as the only specific basis
for TMI's dispute, were never verified. Her representations that Henry Beall had told
her that Ruttiger came to work limping on the day of the injury were not supported
by Henry Beall. Additionally, Henry Beall made contradictory statements regarding
whether Ruttiger even timely reported an on-the-job injury on the day of the injury. 
Given the evidence, no reasonable juror could have doubted that Ruttiger timely
reported his injury. Finally, April Beall's promise to provide Culbert a recorded
statement from a co-worker to confirm that Ruttiger was seeking compensation for
an off-the-job injury never materialized. In sum, a reasonable juror could have
believed that Culbert made his decision to deny Ruttiger's claim after conducting an
extremely limited, one-sided investigation that produced nothing more than highly
suspicious rumors and speculation from two, related employer representatives. 
Considering this evidence, as well as Ruttiger's direct testimony that he had, in fact,
suffered an on-the-job-injury, a reasonable juror could have found that, at the time
TMI denied Ruttiger's claim, coverage for Ruttiger's injuries had become reasonably
clear. 

 Furthermore, even Culbert agreed that, under the governing rules for
conducting an adequate investigation, a "rumor" could never form the basis for
refusing to pay a claim. Yet, the unsubstantiated rumor that Ruttiger was actually
injured playing softball, provided by April Beall, was the only specific basis used by
TMI to deny Ruttiger's claim. Thus, by its own standards, as well as the standards
imposed by the Insurance Code, TMI failed to fulfill its obligation to conduct an
adequate investigation before denying Ruttiger's claim. A reasonable juror could
have concluded that, at the time TMI denied Ruttiger's claim, there was simply no
information supporting a "bona fide" coverage dispute. Contrary to TMI's argument,
the evidence certainly did not "conclusively" establish "powerful reasons" to dispute
Ruttiger's claim. 

 Based on our review of all of the evidence, we hold that the evidence is legally
sufficient to support the jury's finding that TMI violated the Insurance Code and
engaged in unfair settlement practices by failing to attempt in good faith to effectuate
a prompt, fair, and equitable settlement of a claim with respect to which its liability
had become reasonably clear and by refusing to pay a claim without conducting a
reasonable investigation with respect to the claim.

 In support of its legal sufficiency challenge, TMI asks us to consider additional
information developed by TMI after filing its July 12, 2004 dispute. We note that
"[w]hether there is a reasonable basis for denial, . . . must be judged by the facts
before the insurer at the time the claim was denied." Viles v. Security Nat. Ins. Co.,
788 S.W.2d 566, 567 (Tex. 1990). However, we recognize that TMI's post-denial
evidence may be relevant because there can be no claim for bad faith when an insurer
has denied a claim that is, in fact, not covered and the insurer has not otherwise
breached the contract. See Republic Ins. Co. v. Stoker, 903 S.W.2d 338, 340-41 (Tex.
1995). 

 After Ruttiger's attorney contacted Culbert in September 2004, TMI reopened
the file and conducted an additional investigation. On September 21, 2004, Culbert
obtained a recorded statement from Adam Popovich, who stated that Ruttiger had
"that hernia for a long time" and Ruttiger had told him that he did not sustain a hernia
at A&H. However, Popovich, in his statement, did not conclusively establish that
Ruttiger's prior hernia injury was what Ruttiger was seeking compensation for, and
Popovich's statement did not foreclose the possibility that Ruttiger had aggravated
this pre-existing hernia. Culbert conceded that Ruttiger still would have sustained a
compensable injury if he had aggravated a preexisting hernia. See City of Pasadena
v. Olvera, 95 S.W.3d 494, 497 (Tex. App.--Houston [1st Dist.] 2002, no pet.) (stating
that definition of injury "includes aggravation of a pre-existing condition"). 

 Culbert, on December 17, 2004, also obtained a statement from David Martin,
who opined that Ruttiger was not actually injured on the job. Ruttiger never told
Martin that he was injured on the job, and Martin felt Ruttiger was "[t]rying to pull
the wool over somebody's eyes." On the other hand, Martin also stated that he would
be surprised if Ruttiger suffered from a hernia prior to June 21, 2004. Neither
Popovich nor Martin provided any evidence that Ruttiger suffered the injury playing
softball.

 We note that, even after TMI obtained Popovich's and Martin's statements,
TMI entered into the Benefit Dispute Agreement with Ruttiger, agreeing that Ruttiger
sustained a compensable injury in the form of bilateral inguinal hernias on June 21,
2004. Thus, this case is unlike those cases in which a party has complained of
damages caused by bad faith delay in payment of benefits that were determined to
never have been due. See Lundstrom, 192 S.W.3d at 96. We also note that Ruttiger's
testimony directly contradicts Popovich's and Martin's statements, and a reasonable
juror, for the reasons cited above, could have been skeptical of at least some of the
information contained in their statements. 

 Finally, after Ruttiger filed the instant suit, TMI discovered records from
UTMB indicating that Dr. Harper had, in fact, diagnosed Ruttiger with bilateral
inguinal hernias and referred him to surgery to correct the hernias in 1998. But
Ruttiger provided testimony disputing TMI's trial theory that Ruttiger's hernias
constituted nothing more than a preexisting condition. When asked about his medical
records, Ruttiger contended that he had only learned of his 1998 hernia diagnosis in
the course of this lawsuit, the pain caused by his injury in 2004 was like nothing that
he had ever experienced, and he had never noticed any bulges before the injury. 
Ruttiger also presented some evidence from his 1998 medical records indicating that
any previous hernia may have been asymptomatic and that he did not suffer from any
major pain at that time. Thus, any evidence that Ruttiger had a preexisting hernia
does not establish that Ruttiger did not sustain a compensable injury in 2004. A
reasonable juror, in determining whether TMI violated the Insurance Code, could
have rejected the evidence developed by TMI after it had already denied Ruttiger's
claim. See City of Pasadena, 95 S.W.3d at 497. The evidence obtained by TMI after
filing its July 12, 2004 dispute does not render the evidence supporting the jury's
findings that TMI violated the Insurance Code legally insufficient. 

 We overrule TMI's first issue. (22)


Knowing Violation

 In its third issue, TMI argues that the evidence is legally insufficient to support
the jury's finding that TMI "knowingly" violated the Insurance Code becauase "the
uncontroverted evidence shows that TMI and its representatives subjectively believed
Ruttiger's claim was not valid." The trial court asked the jury, in question number
two, whether TMI knowingly engaged in violations of the Insurance Code. In
accordance with section 541.002 of the Insurance Code, (23) the court instructed the
jury,

 "Knowingly" means actual awareness of the falsity, unfairness, or
deceptiveness of the act or practice described in Question 2. Actual
awareness may be inferred if objective manifestations indicate that a
person acted with actual awareness.


The jury answered "yes" to this question, and, based on their affirmative answer,
awarded Ruttiger $100,000 for past mental anguish and $20,000 in additional
damages, both of which are recoverable only if the Insurance Code violation was
committed knowingly. See Vazquez, 192 S.W.3d at 777.

 The Texas Insurance Code does not allow policyholders to recover
extra-contractual damages when insurers are merely negligent. Id. Rather, such
damages are reserved for cases in which an insurer knew its actions were false,
deceptive, or unfair. See id. In reviewing all the evidence, we are mindful that
"extra-contractual damages should not be a routine addition to every breach-of-policy
case" and that the Constitution requires exacting appellate review of damages that
punish rather than compensate. See id. at 775. 

 Here, Ruttiger presented evidence that TMI did not attempt to contact him
during the course of its investigation, or, at best, made only minimal efforts to do so. 
The jury was presented with evidence that Culbert relied solely upon April Beall's
unverified statements that Ruttiger had been injured while playing softball, not on the
job. More specifically, the jury heard evidence that although TMI expressly denied
coverage on the ground that Ruttiger was injured playing softball, Henry Beall, an
A&H employee and the alleged source of this information, did not confirm it. Culbert
conceded that he did not speak with anyone who could confirm that Ruttiger was
injured playing softball. Most significant to the jury's "knowingly" finding, Ruttiger
testified that when he called Culbert to explain his side of the story, Culbert hung up
on him and refused to listen to his version of events. Although Culbert denied this,
the jury was entitled not to believe Culbert. See City of Keller, 168 S.W.3d at 811. 
 Given Ruttiger's evidence that Culbert deliberately refused to speak with him,
the evidence that Culbert made little to no effort to contact Ruttiger or his treating
doctors prior to disputing his claim, and the evidence that Culbert instead chose to
rely upon an unverified rumor supplied by A&H, the jury could have reasonably
inferred that TMI was not merely negligent, but instead knowingly engaged in unfair
acts that gave rise to its liability. Again, actual awareness "may be inferred if
objective manifestations indicate that a person acted with actual awareness." See
Tex. Bus. & Com. Code Ann. § 17.45(9). The jury could have reasonably concluded
that TMI "knowingly" failed to attempt in good faith to effectuate a prompt, fair, and
equitable settlement of a claim with respect to which its liability had become
reasonably clear and refused to pay a claim without conducting a reasonable
investigation. As summarized by Ruttiger's insurance expert at trial, by disputing
Ruttiger's claim, Culbert was certifying that the statements contained in his notice of
dispute were "backed up by a reasonable investigation." Here, however, as further
noted by Ruttiger's expert, there was evidence supporting an implied finding that
TMI "used a reason to deny the claim" that simply was not supported by the facts.

 Moreover, as noted by Ruttiger, the jury was entitled to believe that Culbert's
subsequent investigation into any preexisting injury suffered by Ruttiger was merely
an attempt to justify Culbert's prior dispute of Ruttiger's claim. The jury could have
reasonably concluded that this post-dispute investigation was not conducted to
determine whether Ruttiger's preexisting condition actually disqualified him from
workers' compensation coverage. In fact, Culbert conceded that, according to TMI's
own standards, TMI needed "extremely persuasive medical opinions" to deny
coverage based on a preexisting medical condition. He further agreed that, as of the
date of trial, TMI did not have any extremely persuasive medical opinions
establishing this defense. 

 Accordingly, we hold that the evidence is legally sufficient to support the jury's
finding that TMI "knowingly" violated the Insurance Code. 

 We overrule TMI's third issue.

Damages for Physical Pain and Suffering, Physical Impairment, and Mental
Anguish


 In its fourth and fifth issues, TMI argues that the trial court erred in awarding
Ruttiger damages for physical pain and suffering, physical impairment, and mental
anguish because "such damages were not separate and independent from the
underlying physical injury for which Ruttiger sought and received workers'
compensation benefits." TMI asserts that "physical pain and suffering, physical
impairment, and mental anguish directly relate to Ruttiger's physical injury, i.e., the
bilateral inguinal hernia for which he sought and received workers' compensation
coverage." Alternatively, TMI asserts that even if such damages are recoverable, the
evidence is legally insufficient to support the jury's award for past mental anguish. In regard to whether damages for physical pain and suffering, physical
impairment, and mental anguish are recoverable in the instant case, both parties rely
on Aranda v. Insurance Company of North America, 748 S.W.2d 210, 214 (Tex.
1988). In Aranda, two workers' compensation carriers agreed that a covered
employee suffered compensable injuries, but both carriers refused to pay benefits
because they could not agree "as to which carrier bore primary responsibility." Id.
at 211. The supreme court noted that injured employees rely on the carrier for
disability benefits and medical expenses, are "dependent on the carrier for protection
from the economic calamity of disabling injuries," and are otherwise without any
"immediate recourse" for an arbitrary denial of a valid claim. Id. at 212 (emphasis
added). Thus, the court recognized that a carrier has a duty "to deal fairly and in good
faith with injured employees" in processing their claims. Id. at 212-13. The court
concluded that, although the carrier's unreasonable failure to pay benefits might be
rectified through administrative procedures, injured employees "may in the interim
incur substantial damages because of an inability to meet basic living expenses or pay
for medical care." Id. at 212 (emphasis added). 

 The supreme court, in Aranda, also rejected the carriers' argument that the
exclusivity provision of the TWCA barred the employee's claims, noting that "[a]
claimant is permitted to recover when he shows that the carrier's breach of the duty
of good faith and fair dealing or the carrier's intentional act is separate from the
compensation claim and produced an independent injury." Id. at 214 (emphasis
added). The court reasoned that the remedies afforded by the TWCA "are exclusive
only if the injury complained of is an injury contemplated by the Act--a personal
injury sustained in the course of employment," and, thus, the exclusivity provision of
the TWCA "cannot be read as a bar to a claim that is not based on a job-related
injury." Id. In regard to the specific claims asserted in Aranda, the court noted that
the claimant alleged a breach of the duty of good faith and fair dealing "that was
separate from his compensation claim for his work-related disability" and that the
claimant's alleged damages caused by the carrier's failure to pay benefits included
"losses to credit, reputation, and the ability to maintain a job when his credit was a
matter of consideration for his employer." Id. 

 Citing Aranda, the Dallas Court of Appeals has more recently considered the
recovery of damages against a workers' compensation carrier for denying and
delaying payment of benefits. See Hulshouser v. Tex. Workers' Compensation Ins.
Fund, 139 S.W.3d 789, 790 (Tex. App.--Dallas 2004, no pet.). Hulshouser sued the
carrier for bad faith, asserting that its denial and delay in compensating him for a
hernia injury aggravated that condition. Id. Specifically, he alleged that the carrier's
unreasonable denial and delay in paying benefits resulted in permanent disability and
pain that would not have occurred had he received timely medical treatment. Id. 
Hulshouser further alleged that he suffered and would continue to suffer severe
physical and mental pain, suffering, anguish, impairment, loss of earning capacity,
and loss of credit. Id. at 790-91. The trial court granted the carrier partial summary
judgment on the ground that the exclusivity provision of the TWCA barred "the claim
for common law damages related to the hernia condition." Id. at 791.

 In considering the types of recoverable damages, the Dallas Court of Appeals
noted that, in exchange for prompt remuneration to an employee for an on-the-job
injury, the TWCA provides the exclusive remedy for on-the-job injuries and prohibits
the employee from seeking common-law remedies from his employer. Id. at 792. 
The court stated that it "was undisputed that the compensable hernia-related damages
included those stemming directly from the allegedly worsened hernia injury,
complications from delayed surgery, and increased impairment." Id. at 793. The
court affirmed the trial court's dismissal of Hulshouser's claims for damages for his
aggravated physical condition resulting from the insurer's denial and delay in
payment of benefits. In doing so, it held that "the damages at issue directly related
to the hernia condition, and that any delay of the [carrier] did not produce an
'independent injury' as that term is used in Aranda." Id.

 Although the Dallas Court of Appeals focused on the fact that because the
TWCA affords an employee prompt remuneration with no burden of proof as to
negligence, the TWCA actually prohibits the employee from seeking common-law
remedies "against [his] employer or an agent or employee of the employer for . . . a
work related injury sustained by the employee on the job." Tex. Lab. Code Ann. §
408.001(a) (Vernon Supp. 2007). When an employee sues a carrier for its misconduct
in processing his injury claim, the policy behind the exclusivity provision of the Act
that protects the employer from common law claims related to workplace injuries
simply does not apply. As the supreme court stated in Aranda, 

 Liability as a result of a carrier's breach of the duty of good faith
and fair dealing or intentional misconduct in the processing of a
compensation claim is distinct from the liability for the injury arising in
the course of employment. Injury from the carrier's conduct arises out
of the contractual relationship between the carrier and the employee and
is sustained after the job-related injury. 


Aranda, 748 S.W.2d at 214. 

 To the extent that Hulshouser suggests that an employee may not recover for
the additional physical pain and suffering, impairment, or mental anguish caused by
a workers' compensation carrier's misconduct in processing his claim, it ignores the
plain language of Aranda. As stated by the Texas Supreme Court, an injured
employee may in fact "incur substantial damages" as a result of an insurer's breach
of its duties and such injuries, arising out of the relationship between the carrier and
the employee, are "sustained after the job related injury." Id. at 212-14. Nothing in
the TWCA or Aranda prohibits an employee from recovering damages for the
additional aggravated injuries caused by a workers' compensation carrier's
misconduct in handling his claim. Other than Hulshouser, TMI has not cited any
authority that would so severely limit the scope of damages available to an employee
against a workers' compensation carrier for its misconduct in processing a claim. 
Thus, we decline to follow Hulshouser. (24)

 Here, in regard to the jury's awards for past and future physical pain and
suffering and past physical impairment, Ruttiger asserts that "he sought to recover for
the extreme physical pain and impairment that he suffered for eight months as a result
of his inability to secure pain medication after TMI refused to pay for his surgery." 
In support of these claims, Ruttiger cites testimony from his sister, Diana Espinosa,
in which she stated that Ruttiger "got a prescription once for his pain" but then "it
was gone" and there "was no more for eight months." Espinosa stated that, as a result
of Ruttiger's failure to get medications, "it was horrible" and Ruttiger "couldn't get
up out of a chair without making a horrible noise." Espinosa further stated that as a
result of his pain and physical limitations, Ruttiger had difficulty caring for his
children and performing his head-of-household duties, he "couldn't do anything
outside of his apartment," and he was "stuck" there. Ruttiger also testified that his
extended suffering of physical pain was "very strenuous," it was difficult going down
stairs and leaving his apartment, and he "stayed in the house almost all of the time." 
 We hold that the trial court did not err in awarding Ruttiger damages for his
physical pain and suffering and physical impairment because Ruttiger presented
sufficient evidence that TMI's breach of its duty of good faith and fair dealing caused
him to suffer these independent injuries "separate from [his] compensation claim." (25) 
See Aranda, 748 S.W.2d at 214.

 Alternatively, TMI argues that the evidence is legally insufficient to support
the jury's award of $100,000 to Ruttiger for mental anguish damages because "no
evidence shows that Ruttiger sustained compensable mental anguish." We note that,
in most cases, plaintiffs may not recover mental anguish damages unless they
introduce "direct evidence of the nature, duration, and severity of their mental
anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." 
Giles, 950 S.W.2d at 54. In bad faith actions, "mental anguish damages will be
limited to those cases in which the denial or delay in payment of a claim has seriously
disrupted the insured's life." Id.; see also Parkway Co. v. Woodruff, 901 S.W.2d 434,
444 (Tex. 1995). Although "there must be evidence that the amount found is fair and
reasonable compensation," Saenz v. Fidelity & Guar. Ins. Underwriters, 925 S.W.2d
607, 614 (Tex. 1996), a mental anguish award "cannot be determined with
mathematical precision," and "can be determined only by the exercise of sound
judgment." Bentley v. Bunton, 94 S.W.3d 561, 605 (Tex. 2002).

 In support of the jury's mental anguish award, Ruttiger cites Espinosa's
testimony that Ruttiger "got real depressed" because he was stuck inside his
apartment. She explained,

 I saw dark circles under his eyes and I saw him laying [sic] on the
couch not looking at us anymore with his head down. I saw worry. 
He's gotten lines--I promise you he's gotten lines on his forehead in
this two-year time. It's been since all of this has gone on. And since it
took eight months for him to finally get help, he has completely lost
every single thing that he had. He lost his vehicle, he lost his apartment,
he lost his furniture. He's lost everything and everything that he was
worth to himself was gone.


Ruttiger had "sort of" given up, and "it started getting real bad" when he did not have
money "to wash [his children's] clothes" and "started selling his furniture and he just
kept trying and waiting and waiting and waiting for that phone call and he never got
it." Espinosa noted that ultimately Ruttiger's credit was "shot," his phone was turned
off, and he was evicted from his apartment because he could not pay his rent. She
stated that this was particularly hard on Ruttiger because he was a father and was
used to being self-sufficient. Ruttiger was "dwindling away," felt "belittled," and
was "emotionally drained." The ordeal had been "horrifying" for Ruttiger and his
family. 

 Ruttiger himself also testified that he was "angry" because he had been accused
of fraud, he was forced to stay in his house, his physical condition impacted his
relationship with his daughter, and he was humiliated because he had to borrow
money from his father. 

 Ruttiger presented the jury with evidence demonstrating that he suffered a high
degree of mental pain and distress that substantially disrupted his daily
life--independent from the disruptions caused by his compensable hernia injury. See
Bunton v. Bentley, 153 S.W.3d 50, 53 (Tex. 2004) (affirming $150,000 mental
anguish award based on evidence that plaintiff's ordeal had deprived him of sleep,
caused him embarrassment in community, disrupted his family, distressed his
children, caused him depression, and impugned his honor and integrity and that
"plaintiff would never be the same"); see also Service Lloyds Ins. Co. v. Greenhalgh,
771 S.W.2d 688, 691-92 (Tex. App.--Austin 1989), rev'd on other grounds, 787
S.W.2d 938 (Tex. 1990) (affirming $8,000 mental anguish award against insurer for
bad faith based on evidence that employee suffered extreme embarrassment, was
forced to borrow money to pay for medical care, was fired after investigator made
threats to his current employer, lost sleep, felt like a failure, and had low self-esteem). 
Accordingly, we hold that the evidence is legally sufficient to support the jury's
award of $100,000 for mental anguish damages. (26) 

 We overrule TMI's fourth and fifth issues.

Damages for Loss of Credit Reputation

 In its sixth issue, TMI contends that the evidence is legally insufficient to
support the jury's award of $11,500 for past damage to credit reputation and $5,000
for future damage to credit reputation because he presented no evidence that he
applied for credit and was turned down or charged a higher interest rate. 

 "To recover actual damages for loss of credit reputation, a plaintiff must show
that a loan was actually denied or a higher interest rate was charged and "[t]here must
be a showing of injury, as well as proof of the amount of that injury." EMC Mortg.
Corp. v. Jones, 252 S.W.3d 857, 872 (Tex. App.--Dallas 2008, no pet. h.) (citing St.
Paul Surplus Lines Ins. Co., v. Dal-Worth Tank Co., 974 S.W.2d 51, 53 (Tex. 1998)
and Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 199 (Tex. 1998)). The
amount of damages for the loss of credit reputation must only be established with the
degree of certainty to which it is susceptible. EMC Mortg. Corp., 252 S.W.3d at 872 
(citing Sw. Bell Tel. Co. v. Sims, 615 S.W.2d 858, 864 (Tex. Civ. App.--Houston [1st
Dist.] 1981, no writ)). Ruttiger contends that he presented the "best possible
evidence" by introducing into evidence a copy of his credit report showing a negative
credit rating and his financial records showing his "calamitous decline in [his]
earnings after his injury." Ruttiger also cites Espinosa's testimony that Ruttiger's
"credit [was] shot" and that Ruttiger got kicked out of his apartment because he
"couldn't pay for it anymore." 

 However, Ruttiger did not present any evidence that he was actually denied
credit or charged a higher interest rate, i.e., that he actually sustained damages as a
result of a loss of credit reputation. Accordingly, we hold that the evidence is legally
insufficient to support the jury's awards to Ruttiger for his damage to his credit
reputation.

 We sustain TMI's sixth issue. 

Conclusion

 We modify the judgment to delete that portion of the judgment awarding
Ruttiger damages for his loss of credit reputation. We affirm the judgment of the trial
court as modified. 

 

 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Keyes.



1. See Tex. Ins. Code Ann.§§ 541.001-541.454, seq., 542.001-542.302 (Vernon Supp.
2007).
2. See Tex. Bus. & Com. Code Ann. § 17.41-.63 (Vernon Supp. 2007).

3. An "inguinal hernia" is a hernia into the inguinal canal, which is "the oblique passage
through the layers of the lower abdominal wall that transmits the spermatic cord in the
male." The American Heritage Stedman's Medical Dictionary 416 (2002).
4. All parties agree that, after entering into the Benefit Dispute Agreement, TMI paid
Ruttiger income and impairment benefits, Ruttiger received surgery for his injuries,
and Ruttiger received all the benefits that he was entitled to receive under the Benefit
Dispute Agreement. 
5. See Tex. Ins. Code Ann. § 541.152(b) (Vernon Supp. 2007).
6. See Tex. Lab. Code Ann. chs. 409-419 (Vernon 2006 & Supp. 2007).
7. We note that section 410.151 provides that an issue "that was resolved at a benefit
review conference may not be considered [at a contested case hearing] unless the
parties consent." Tex. Lab. Code Ann. § 410.151 (Vernon 2006). Thus, the Act does
appear to provide an avenue whereby the parties, by agreement, may proceed in the
administrative process with an issue that has already been resolved by agreement. See
id. However, there is no evidence that the parties entered into any such agreement in
this case and, thus, the Benefit Dispute Agreement here remained a binding agreement
on all parties.
8. In its reply brief, TMI also relies on Pickett v. Texas Mutual Insurance Co., 239
S.W.3d 826 (Tex. App.--Austin 2007, no pet.). In Pickett, although the parties
entered into a benefit dispute agreement to determine which of the claimant's
disorders were causally related to a compensable injury, the court specifically noted
that the agreement did not determine "what treatments would be medically necessary
and reasonable for those conditions" and the carrier "remained responsible for
reviewing [the claimant's] submitted medical bills and preauthorization requests to
determine whether a medical treatment related to her compensable injuries or her non-compensable injuries." Id. at 831. The court noted that the agreement "did not resolve
any issues concerning [the claimant's] entitlement to medical benefits," and, thus, the
claimant was required to exhaust administrative remedies and obtain a favorable
determination from the Commission before proceeding to court. Id. at 837. Here,
there is no suggestion in the record that, following the parties' entry into the Benefit
Dispute Agreement, any dispute remained regarding what specific benefits Ruttiger
was entitled to recover. Again, both parties suggest in their briefing that Ruttiger
received all the benefits he was entitled to receive; Ruttiger's claims focus solely on
TMI's delay in paying these benefits.


 In its motion for rehearing, TMI argues, for the first time, that Ruttiger should have
pursued medical treatment orders or interlocutory orders to provide for surgery and
income benefits while the parties disputed compensability. TMI further complains
that Ruttiger should have requested a benefit review conference more quickly. First,
we note that TMI never raised these arguments in the trial court or in its original
appellate briefing. See Tex. R. App. P. 33.1; see also Avco Corp. v. Interstate Sw.,
Ltd., 251 S.W.3d 632, 676 (Tex. App.--Houston [14th Dist.] 2007, pet. filed)
("Generally, we do not base our rulings on arguments raised for the first time on
rehearing."); OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P., 234 S.W.3d
726, 747 (Tex. App.--Dallas 2007, pet. filed) ("The sole purpose of a motion for
rehearing is to provide the court an opportunity to correct any errors on issues already
presented."). Second, in regard to TMI's assertion that these matters relate to the trial
court's jurisdiction, Fodge does not stand for the proposition that, by failing to seek
interlocutory orders or failing to more quickly seek a benefit review conference, 
Ruttiger had somehow failed to exhaust his administrative remedies as to the
compensability dispute before he filed suit. 63 S.W.3d 801.


 In a supplemental letter to its motion for rehearing, TMI also asks us to reconsider this
case in light of Schwartz v. Insurance Co. of State of Pennsylvania, No.
01-07-00193-CV, 2008 WL 2466258 (Tex. App.--Houston [1st Dist.] June 19, 2008,
no pet. h.). In that case, this Court concluded that there had been no TWCC ruling on
the disputed issue, i.e., the initial denial of surgery. Id. at *2. We held that "an
unresolved dispute as to the surgery's medical necessity . . . still existed when
Schwartz filed suit." Id. In contrast, here, Ruttiger's suit for insurance code
violations and bad faith is based upon TMI's unreasonable compensability dispute,
a dispute that was resolved by the Benefit Dispute Agreement. Ruttiger has never
complained that, once compensability was resolved in the Benefit Dispute Agreement,
TMI delayed benefits. Applying TMI's rationale, a party would never be able to file
suit against an insurer based upon a compensability dispute, no matter how
unreasonable the dispute, as long as the insurer promptly provided benefits once it
entered into the Benefit Dispute Agreement and agreed to compensability. 
9. See Tex. Ins. Code Ann. §§ 541.060, 541.061 (Vernon Supp. 2007)
10. See id. (Vernon Supp. 2007).
11. See id. § 541.061(2).
12. See id. § 541.061(3).
13. See id. § 541.060(a)(1).
14. See id. § 541.060(a)(2)(A).
15. See id. § 542.003(b)(3) (Vernon Supp. 2007). 
16. See id. § 541.060(a)(3).
17. See id. § 541.060(a)(7).
18. The standards for liability under sections 541.060(a)(2) and (a)(7) and for an insurer's
breach of the common law duty of good faith and fair dealing are similar and are
frequently discussed together by Texas courts. See, e.g., United Servs. Auto. Ass'n v.
Croft, 175 S.W.3d 457, 471-72 (Tex. App.--Dallas 2005, no pet.) (holding that
disposition of common law duty of good faith and fair dealing controlled disposition
of claims brought under sections 541.060(a)(2) and (a)(7)). Accordingly, we refer to
cases considering the sufficiency of the evidence to support both findings of Insurance
Code violations and the breach of good faith and fair dealing. 
19. The transcript of the recorded statement indicates that the doctor identified by Henry
Beall was "Tameka [ph] Pamela Hopkins." However, the recorded statement clearly
reflects that Henry Beall was referring to a copy of a letter in his possession when he
recited the name.
20. In its original briefing, TMI stated that, during this phone call, Culbert denied
preauthorization. In its motion for rehearing, TMI clarifies that during this phone call,
Culbert did not deny preauthorization because doing so would have been beyond his
authority as an adjuster. Instead, Culbert informed UTMB that TMI had disputed
Ruttiger's claim. The record contains evidence that supports an implied finding that
UTMB cancelled Ruttiger's scheduled surgery after Culbert informed UTMB of
TMI's dispute of Ruttiger's claim.
21. As noted below, TMI subsequently obtained records from Dr. Harper after the filing
of this lawsuit.
22. Having held that the evidence is legally sufficient to support a finding that TMI
engaged in unfair settlement practices on these grounds, we need not address TMI's
remaining arguments in its first issue; TMI's second issue, in which it contends that
the evidence is legally insufficient to support Ruttiger's alternative causes of action
for breach of the common law duty of good faith and fair dealing and violations of the
Texas Deceptive Trade Practices Act; and its eighth issue, in which it contends that
no cause of action exists in Texas for breach of the duty of good faith and fair dealing
in the context of a workers' compensation claim. 
23. Tex. Ins. Code Ann. § 541.002 (Vernon Supp. 2007).
24. We note that the actual holding of Hulshouser may be somewhat limited by the fact
that the trial court had separately ruled that Hulshouser could seek damages that "did
not arise from the hernia condition, including damage to his credit and/or mental
anguish resulting directly from a denial of, or delay in, payment of compensation
benefits." See Hulshouser v. Tex. Workers' Compensation Ins. Fund, 139 S.W.3d
789, 791 (Tex. App.--Dallas 2004, no pet). 
25. In its reply brief, TMI argues that TMI could not be the legal cause of these damages
because "Ruttiger could have obtained treatment through his group health insurance,
even though his workers' compensation claim was pending and in dispute." However,
Culbert testified that he never told Ruttiger to seek coverage under his group health
insurance. Culbert also agreed that, if the injury was sustained on the job, as Ruttiger
contended, workers' compensation would provide the applicable coverage for that
claim. The jury apparently believed that TMI was liable for failing to pay the claim.
Moreover, Ruttiger testified that his health insurance was not an option because he
was hurt on the job, could not return to work, and his employment with A&H was
terminated. 
26. On appeal, TMI complains that Ruttiger was not entitled to a double recovery for the
same damages under different categories. However, the trial court specifically
instructed the jury to "consider each element [of damages] separately" and to "not
include damages for one element in any other element." Unless the record
demonstrates otherwise, we must presume that the jury followed these instructions. 
Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 770-71, 773-74 (Tex.
2003). There is nothing in the record to demonstrate that the jury did not follow these
instructions.